1              **UNITED STATES DISTRICT COURT**

2                    **DISTRICT OF OREGON**

3                   **PORTLAND DIVISION**

4  DON HILL,                        )
                                    )
5              Plaintiff,           )    No. 03:11-cv-01014-HU
                                    )
6  vs.                              )
                                    )
7  MICHAEL J. ASTRUE,               )  **FINDINGS AND RECOMMENDATION**
   Commissioner of Social Security, )
8                                   )
               Defendant.           )
9            _____

10

11 Lisa R.J. Porter
   KP Law LLC
12 16200 SW Pacific Highway
   Suite H-233
13 Portland, OR 97224

14      Attorney for Plaintiff

15

16 S. Amanda Marshall
   United States Attorney
17 Adrian L. Brown
   Assistant United States Attorney
18 1000 S.W. Third Avenue, Suite 600
   Portland, OR 97204-2904

19

20 David Morado
   Regional Chief Counsel, Region X, Seattle
21 Franco L. Becia
   Assistant Regional Counsel
22 Office of the General Counsel
   701 Fifth Avenue, Suite #2900 M/S 901
23 Seattle, WA  98104-7075

24      Attorneys for Defendant

25

26

27

28

1 - FINDINGS & RECOMMENDATION

HUBEL, United States Magistrate Judge:

The plaintiff Don Hill seeks judicial review pursuant to 42 U.S.C. § 405(g) of the Commissioner's final decision denying his application for Disability Insurance ("DI") benefits under Title II of the Social Security Act, 42 U.S.C. § 1381 *et seq.* Hill argues the Administrative Law Judge ("ALJ") erred in finding Hill less than fully credible, giving improper weight to the opinions of his treating physicians and the consulting psychologist, concluding his activities of daily living are evidence of the ability to perform full-time work, failing to take vocational testimony, and assessing his residual functional capacity. *See* Dkt. # 17.

## I.   PROCEDURAL BACKGROUND

Hill protectively filed his application for DI benefits on December 10, 2007, at age 46, claiming disability since January 1, 2008[1], due to chronic pain, "heart problems," and fibromyalgia. (A.R. 15, 65, 73, 122, 149[2]) Hill's applications were denied initially and on reconsideration. (A.R. 73-77, 79-82) Hill requested a hearing, and a hearing was held on March 15, 2010, before an ALJ. Hill testified in his own behalf. Although a

---

[1]In his application for benefits, Hill listed a disability onset date of May 26, 2005. At the ALJ hearing, he amended the date to January 1, 2008. (A.R. 40)

[2]The administrative record was filed electronically using the court's CM/ECF system. Dkt. #11 and attachments. Pages of the record contain three separate page numbers: two located at the top of the page, consisting of the CM/ECF number (e.g., Dkt. #11-3, Page 16 of 63); a Page ID#; and a page number located at the lower right corner of the page, representing the numbering inserted by the Agency. Citations herein to "A.R." refer to the agency numbering in the lower right corner of each page.

2 - FINDINGS & RECOMMENDATION

1  Vocational Expert ("VE") was present at the hearing, no questions
2  were posed to the VE, and no testimony was taken from the VE.
3  (A.R. 33-62)   On July 15, 2010, the ALJ issued his decision,
4  denying Hill's application for DI benefits.   (A.R. 12-27) Hill
5  appealed the ALJ's decision, and on May 5, 2011, the Appeals
6  Council denied his request for review (A.R. 4-7), making the ALJ's
7  decision the final decision of the Commissioner.  *See* 20 C.F.R.
8  §§ 404.981, 416.1481.  Hill filed a timely Complaint in this court
9  seeking judicial review of the Commissioner's final decision
10 denying his application for DI benefits.  Dkt. #2.  The matter is
11 fully briefed, and the undersigned submits the following findings
12 and recommended disposition of the case pursuant to 28 U.S.C.
13 § 636(b)(1)(B).

14

15                      **II.   FACTUAL BACKGROUND**

16                  **A.   Summary of the Medical Evidence**

17      On January 26, 2005, Hill saw Christine Wasilewski, M.D. at
18 Kaiser Permanente ("Kaiser") for followup of fibromyalgia.  He
19 complained of fatigue and increased pain, stating he had "no
20 energy," and had "been exhausted all day long for [the] past
21 several weeks." (*Id.*)  Over-the-counter ibuprofen was upsetting
22 his stomach, and Vicodin was not controlling his pain.  Hill also
23 complained of "depressed mood, anhedonia, irritability, trouble
24 concentrating, [and] isolation." (*Id.*)  He had taken Prozac in the
25 past, and was agreeable to going back on the medication, so it was
26 prescribed.  The doctor indicated Hill's fibromyalgia, depression,
27 and fatigue were "all inter-related." (A.R. 448)  In addition to
28 the Prozac, she also prescribed Etodolac for muscle aches, which

3 - FINDINGS & RECOMMENDATION

1  she believed would be easier on Hill's stomach.  She opined this
2  would allow him to increase his physical activity which, in turn,
3  would help his overall energy level.  (*Id.*)

4       Hill saw Dr. Wasilewski at Kaiser on April 12, 2005, for
5  followup of his "ongoing irregular heart beats." (A.R. 447)  Hill
6  stated the problem bothered him every day.  He had taken 12.5 mg.
7  of Atenolol the previous evening, and had felt lightheaded ever
8  since, with no change in his irregular heartbeats.  The doctor
9  indicated the medication was causing Hill's lightheadedness and
10 bradycardia, and she referred Hill back to a cardiologist for
11 followup to discuss other pharmacologic options.  (*Id.*)

12      On April 15, 2005, Hill saw family practitioner Megan R.
13 Edwards, M.D. at Kaiser for a complaint of palpitations.  Hill
14 reported having an attack of palpitations that morning so severe
15 that he was tempted to take an Atenolol, even though the drug made
16 him feel unwell and lightheaded.  "Instead he took a Xanax which he
17 has prescribed for anxiety." (A.R. 446)  He reported much improved
18 symptoms after the Xanax, with no chest pain, shortness of breath,
19 or nausea.  He was diagnosed with "possible aberrant impulse in
20 myocardium[,] [l]ikely exacerbated by significant anxiety, as
21 evidenced by improvement of symptoms with xanax." (*Id.*)  The
22 doctor prescribed Clonazepam "for more sustained control," and
23 Xanax as needed.  (*Id.*)

24      On May 25, 2005, Hill saw cardiologist Alison Fulmer, M.D. at
25 Kaiser for followup of his premature ventricular contractions
26 ("PVCs").  He was feeling much improved on Clonazepam, and having
27 fewer PVCs. Hill was "happy with present circumstances." (A.R.
28 445)

4 - FINDINGS & RECOMMENDATION

Hill saw a nurse practitioner in the Sleep Clinic at Kaiser on July 13, 2005, on referral from Kaiser physician Derrick E. Custino, M.D. (a family practitioner who appears to have been Hill's primary care physician at this time), "for evaluation of possible sleep apnea." (A.R. 443) A sleep study was scheduled, and Hill was given information on insomnia and other recommended reading. (A.R. 443-44)

On July 15, 2005, Hill saw Dr. Custino for followup of back, shoulder, and neck pain arising from a motor vehicle accident on May 26, 2005. Hill stated his pain was 10/10 at times, but he also had some pain-free days. He was receiving physical therapy, and working part-time at about 60%. He was diagnosed with a cervical sprain/strain, and prescriptions for Flexeril and Vicodin were refilled. (A.R. 442)

Hill was seen in the ER on July 21, 2005, with a complaint of "acute onset of heavy pain and a pressure like sensation in his chest at around 8 p.m." (A.R. 375) Hill said it felt like his heart was "skipping beats." (Id.) He had some associated nausea, as well. The examining physician opined Hill's chest pain was "likely that of a GI source," but he nevertheless requested a cardiology consult. (A.R. 376) The cardiologist noted Hill "has a history of premature ventricular contractions," and "had a complete workup in January 2004, when he was admitted for atypical chest pain." (A.R. 377) A coronary angiogram had shown "normal coronary arteries, [and] normal left ventricular function." (Id.) At that time, doctors had indicated Hill could take atenolol if his PVCs were bothersome, but Hill had "stopped taking medications." (Id.) Hill also had a history of panic attacks and depression.

5 - FINDINGS & RECOMMENDATION

1  (*Id.*)  Hill's current symptoms had begun "after he ate a hamburger
2  at a Burger King."  (*Id.*)    The doctor did not believe Hill's
3  discomfort was cardiac related, and he was discharged to home, with
4  directions to avoid fatty and spicy foods, take Prilosec daily, and
5  follow up with his private physician.  (A.R. 377-78)

6      On July 29, 2005, a CT of Hill's lumbar spine showed "[n]eural
7  foraminal stenosis on the right at L5-S1 due to right lateral disk
8  protrusion."  (A.R. 535)

9      On August 2, 2005, Hill was seen in the ER with a complaint of
10  irregular  heartbeat,  with  some  lightheadedness  and  dizziness.
11  Notes indicate Hill "has had PVCs, [and] bigeminy and trigeminy,"
12  and he was being treated with Klonopin.  (A.R. 371)  An EKG showed
13  PVCs that would start and then stop.  He was discharged in stable
14  condition,  and  directed  to  follow  up  with  his  primary  care
15  physician.  (A.R. 372)

16      Hill saw Dr. Custino on August 17, 2005, for followup of his
17  palpitations.    The  doctor  suspected  Hill's  chest  pain  was  GI
18  related, possibly due to peptic ulcer disease, GERD, gastritis, or
19  esophageal spasm.  (A.R. 442)  He prescribed Prilosec, and ordered
20  lab tests.  (*Id.*)

21      On  August  31,  2005,  Hill  saw  Physical  Medicine  and
22  Rehabilitation specialist Kadavil R. Satyanarayan, M.D., at Kaiser,
23  for followup of his fibromyalgia.  Hill stated "he was about 80%
24  back to normal until he was involved in another MVA (his third) on
25  May 26th."  (A.R. 440)  After the  accident,  he had experienced
26  severe flares of his neck and back pain.  He had been receiving
27  physical therapy treatments, and had a referral to the pain clinic.
28  Hill complained that his back pain was radiating down both legs,

6 - FINDINGS & RECOMMENDATION

along the front and back of his thigh.  He also had pain in his neck and shoulders, but not as much as in his back. Walking made his back pain worse.  He was using a hot tub.  He reported "working almost 50% of the time with some difficulty still." (*Id.*)  On examination, Hill exhibited "[a] lot of grimacing when he trie[d] to walk or move." (*Id.*)  His gait was guarded, but normal.  He could go up on heels and toes with no evident muscle weakness.  He had almost full range of motion of his cervical spine, and about 70% shoulder range of motion without pain.  Bending over caused pain complaints.  He had "about 14 of the [fibromyalgia] trigger points present." (*Id.*)  A CT of Hill's lumbar spine showed "L5-S1 disc fragment on the right causing narrowing of the foramina." (*Id.*)

Hill was diagnosed with a lumbosacral sprain, and a cervical sprain/strain.  He was directed to continue his self-care and exercise activities, and go to the pool for water exercises.  The doctor prescribed Flexeril 10 mg. at night to help him sleep, but also directed Hill to discuss this with his cardiologist.  He was encouraged "to gradually increase his work to full time status." (A.R. 441)  The doctor declined to write a letter stating Hill had been on light duty in the past, noting this should be done by the doctor who ordered light duty previously.[3]  (*Id.*)

Hill saw Internal Medicine specialist Anna P. Peter, M.D., at Kaiser, on September 7, 2005, for followup of his ongoing low back pain.  Hill reported hearing "something pop" a few days earlier, "after which [his] pain got considerably worse, shooting down both

---

[3]The Record does not indicate what doctor originally imposed the light duty restriction.

7 - FINDINGS & RECOMMENDATION

1  legs." (A.R. 440)  His exam was unchanged since his last physical
2  therapy visit, and he already had a referral for an epidural
3  injection.  The doctor prescribed a trial of long-acting morphine,
4  with Vicodin for breakthrough pain. (*Id.*)

5      On September 10, 2005, Hill was evaluated in the Kaiser Sleep
6  Lab for sleep apnea.  He was diagnosed with "severe obstructive
7  sleep apnea syndrome," and was "adequately treated with [a] nasal
8  CPAP[.]"  (A.R. 438-39)

9      Hill saw Dr. Fulmer on September 23, 2005, for followup of his
10 PVCs.  He was doing well on his present prescriptions. (A.R. 437)

11     Hill saw Dr. Custino on September 27, 2005, to discuss his
12 pain contract.  Notes indicate Hill had a "[r]ecent abnormal CT
13 scan." (*Id.*)  He was taking sustained-release morphine sulfate, 30
14 mg. three times daily, which "seem[ed] to be helping quite a bit
15 with [his] pain." (*Id.*)  He also had a prescription for short-
16 acting morphine 30 mg./day as needed.  The short-acting morphine
17 was increased to 50 mg., and Hill's pain contract was modified
18 accordingly. (*Id.*)

19     On October 7, 2005, Hill saw Dr. Custino to discuss pain
20 management for his ongoing back pain.  (A.R. 436) Hill stated
21 physical therapy had helped him somewhat with pressure he had been
22 experiencing in both of his thighs.  He had delayed getting an
23 epidural steroid injection due to getting the flu.  He had noticed
24 some tremors with three-times-daily morphine sulfate, so he was
25 switched back to Vicodin. In addition, Hill had been excused from
26 his job as an appliance repairman since September 7th, and he
27 wanted a letter allowing him to return to light duty work, although
28 he requested that the letter not indicate the release was "per his

8 - FINDINGS & RECOMMENDATION

request."   (A.R. 435-36) Hill signed a pain contract for the Vicodin.   The doctor provided a work release restricting Hill to lifting no more than fifteen pounds, and no excessive bending, squatting, pushing, or pulling, until reassessment in two months. (A.R. 436)

On October 25, 2005, Hill received L5-S1 bilateral epidural injections, administered by Roy A. Slack, M.D.   Prior to the injections, Hill rated his pain as 7/10 in the low back and left buttock, and 6/10 in the right buttock and left leg.   (A.R. 476) Post-injection, he rated his back pain at 4/10, bilateral buttock pain at 2/10, and left leg pain at 0/10.   (*Id.*)   Based on Hill's response to the injections, the doctor opined "the L5-S1 motion segment may be the level of his primary pain generator."   (A.R. 477)

Hill saw a physician's assistant on October 28, 2005, reporting that his pain had been increasing ever since the steroid injection, and Vicodin was not keeping up with the pain.   He appeared uncomfortable and moved guardedly.   The injection site did not appear infected, and the physician's assistant opined Hill was "having a flare of pain due to the steroid injection." (A.R. 435) He prescribed Percocet, hoping Hill's pain would improve to the point that he could "go back to his vicodin pain plan with Dr. Custino."   (*Id.*)

Hill saw Dr. Satyanarayan on November 3, 2005, for followup of ongoing pain in his lumbosacral spine.   Hill reported continuing pain in his back and both legs.   The steroid injection had helped, but only briefly.   He was having problems sleeping, and was not tolerating a C-PAP machine he had been given in the sleep lab.   He

9 - FINDINGS & RECOMMENDATION

reported frequent dreams and nightmares. He was taking Percocet and Vicodin for pain, and was not exercising much, stating he had "[n]o time to go to [the] pool because he [was] busy with his children." (A.R. 434) He reported working 40% of the time "at the recommendation of his [primary care physician]." (*Id.*) On examination, Hill appeared anxious. He exhibited normal stance and gait, and full trunk range of motion, with some back pain at the end of the range. He had tenderness over the "LS angle," and also exhibited multiple trigger points of fibromyalgia. The doctor "once again emphasized" the need for Hill to begin a pool exercise program and general conditioning exercises. He directed Hill to use ice/heat and stretching, and continue to work 40% of the time until directed otherwise. He discussed the possibility of starting Hill on Trazodone, but ultimately "decided against it because of his [history of] nightmares in the past." (*Id.*)

Hill received a second set of epidural injections from Dr. Slack on November 21, 2005. Pre-injection, he rated his pain as 7/10 in the low back and left buttock, and 3/10 in the right buttock, bilateral legs, and bilateral feet. (A.R. 472) Post-injection, he rated his back pain at 4/10, left buttock pain at 0/10, right buttock pain at 4/10, and bilateral leg and foot pain at 0/10. (*Id.*)

Hill returned to see Dr. Slack on December 16, 2005, for a third set of injections. Pre-injection, Hill rated his low back and left buttock pain at 8/10, and right buttock and left leg pain at 7/10. Post-injection, his pain was 0/10 in all areas, and Hill was noted to be "pleased with his level of comfort." (A.R. 474)

10 - FINDINGS & RECOMMENDATION

On January 5, 2006, Hill was seen in the Family Practice Clinic, stating he wanted to "set the record straight" regarding his chronic back pain, and find out "the plan" for his pain management.  A neurology evaluation was ordered, and Hill was started on nortriptyline as part of his pain protocol.  (A.R. 432)

Hill was seen in the ER on January 18, 2006, for a complaint of chest pain.  Records indicate Hill had a history of "fibromyal-gia, anxious depression with panic disorder and chronic back pain[.]"  (A.R. 252)  He had run out of his pain medication two days earlier, with escalating back pain since then.  Hill stated he had been reading the paper when he "had the onset of substernal chest pressure and ache radiating to his left arm.  He also had dyspnea associated with this."  (A.R. 252)  Paramedics gave him nitroglycerin, which provided "minimal relief."  (*Id.*)  He had a nitroglycerin drip in the ER "which also helped minimally," and he was given opiates to relieve his pain.  (*Id.*)

Notes indicate Hill's history of chest pain had been evaluated previously, in 2004, with a "treadmill test, nuclear scan, and coronary angiography all of which ultimately showed a focal apical defect and completely clean coronary arteries."  (*Id.*)  A chest x-ray was normal.  (A.R. 261)  The etiology of his current chest pain was noted to be "unclear," but doctors doubted the pain was cardiac in nature, given Hill's age and his "history of clean coronaries 2 years ago[.]"  (A.R. 253)  Hill was noted to experience "[f]requent premature ventricular contractions, particularly with exertion and associated with stress of pain," but the doctor felt the condition did not warrant any type of treatment unless it caused Hill

1  concern, in which case he might try an outpatient heart monitor.
2  (A.R. 253-54)

3      Hill saw Dr. Custino on January 25, 2006, for followup of his
4  chronic nonmalignant pain.    Hill expressed "multiple concerns
5  regarding his pain management."  (A.R. 431)  He also was concerned
6  that his "liver function studies were trending towards the upper
7  limit of normal," so he had stopped taking his Lovastatin.   The
8  doctor advised Hill to wait until after his neurosurgery consult,
9  and if he was not a surgical candidate, then they would try some
10 type of sustained-release medication for pain management.  For the
11 time being, Hill was directed to continue taking oxycodone as
12 needed for pain. (*Id.*)

13     On February 1, 2006, Hill saw neurosurgeon Richard S. Polin,
14 M.D. for an outpatient neurosurgery consultation.   The doctor's
15 dictation was lost, and when he attempted to recreate it in May
16 2006, he no longer recalled all the details of Hill's examination.
17 As he recalled, on neurologic examination, Hill had shown "only
18 give-way weakness with no sensory or reflex loss.  Range of motion
19 was poor and effort dependent."  (A.R. 429)  The doctor found no
20 justification for surgical intervention, and recommended Hill
21 return to physiatry or rheumatology for further treatment.  (A.R.
22 429-30)

23     Hill was seen in the ER on February 1, 2006, for a complaint
24 of "Chest pressure."  (A.R. 246)  Records from the visit recite the
25 following history:

26             A 44-year-old male with past history of chest
               pain that was evaluated with coronary angiog-
27             raphy as well as nuclear scan which showed
               clean coronary arteries.   He also has a
28             history of hypercholesterolemia and panic

12 - FINDINGS & RECOMMENDATION

attacks.  After he had a run in with a man who was going to turn off the gas at his house, he began to feel stressed.  He began to have pressure-like chest pain radiating to the left arm and jaw as well as shortness of breath and disphoretic-type symptoms. . . .  In the emergency department he was found to be bradycardic to 40.  He was given atropine, and pacers were placed.  Of note, on last admit, he was discharged with a heart rate of 45. His review of systems is negative except as per History of Present Illness.

(*Id.*)  An electrocardiogram and chest x-ray were unremarkable. (A.R. 247)  Hill's present medications were noted to be Prozac (an antidepressant), 20 mg. daily; Klonopin (used to treat panic disorders), "2 to 4 [by mouth] daily"; Prilosec (for GERD), 20 mg. daily; Relafen (an arthritis medication), 500 mg. twice daily; and Codeine, 5 to 10 mg. as needed for pain.  (A.R. 246-47)  The treating doctor indicated Hill's chronic pain would be treated with "some oxycodone and Tylenol," as needed.  (A.R. 248)  He indicated he would "continue the Paxil [sic[4]] as well as the Klonopin for [Hill's] panic attacks and his anxious depression."  (*Id.*)

An MRI of Hill's lumbosacral spine on February 10, 2006, showed "mild degenerative disk disease," with no evidence of disk protrusion or significant spinal stenosis from T12-L1 through L4-L5.  At the L5-S1 level, the study showed moderate degenerative disk disease and bilateral neural foraminal narrowing, with no evidence of disk protrusion.  (A.R. 536)

Hill was seen in the ER on March 6, 2006, on referral from Physical Therapy.  He had been seen at a Kaiser clinic that morning

_____

[4]It appears this reference to "Paxil" was erroneous, as Hill's list of current medications indicates he was taking Prozac.  (A.R. 246)  He was still taking Prozac in October 2006.  (*See* A.R. 402)

13 - FINDINGS & RECOMMENDATION

with a complaint of bowel incontinence, "where he was evaluated
with normal rectal tone."   (A.R. 367; *see* A.R. 425-26)
After talking with a neurosurgeon, he was sent home, and then
presented for physical therapy in the afternoon. (*See* A.R. 427-28)
The physical therapist was concerned because Hill "seemed to have
increased weakness of the lower extremities along with some
numbness," bilaterally. (A.R. 367)  As a result, he was told to go
to the ER for further evaluation.   On examination, he exhibited
"excellent strength in knee extension," but "moderate weakness and
dorsiflexion, particularly . . . of his great toes." (A.R. 367-68)
Sensation was intact, as was proprioception[5], with deep tendon
reflexes "1 plus and equal in the knees and ankles." (A.R. 368)
Hill was sent for an immediate MRI of his back.  The study showed
"evidence of some degenerative changes, mild spinal stenosis, and
mild disk protrusion, but no evidence of central disk herniation or
findings consistent with cauda equina syndrome."  (*Id.*)   He was
discharged in "[f]air" condition.  (*Id.*)

    On March 24, 2006, Hill went to the ER with a complaint of
back pain, stating he had experienced urinary incontinence the
previous evening.  Records indicated Hill had a history of "chronic
neck and back pain extending back for years," related to three
motor vehicle accidents.  (A.R. 364)  Hill stated he was "able to

_____

    [5]"Proprioception" is defined as "[a] sense or perception,
usually at a subconscious level, of the movements and position of
the body and especially its limbs, independent of vision; this
sense is gained primarily from input from sensory nerve terminals
in muscles and tendons (muscle spindles) and the fibrous capsule of
joints combined with input from the vestibular apparatus."
STEDMANS 335090 (on Westlaw), Stedman's Medical Dictionary (27th
ed. 2000).

14 - FINDINGS & RECOMMENDATION

work in a very limited capacity, approximately 15 hours a week," which had been the case "for several years." (*Id.*) Hill ambulated without difficulty, and he denied any significant pain. While waiting in the lobby, he "called quality management" because he was concerned about his symptoms the previous evening, and as a result, he was moved "ahead of all the other patients in the lobby," and was seen immediately. (A.R. 365) Hill's drug screen was "completely negative," which the doctor found confusing in light of Hill's report that he was taking benzodiazepines and "Roxicodone on a consistent basis," for pain. (*Id.*) On examination, Hill had a normal straight-leg-raising exam, sensorimotor exam, and rectal tone, and he had had no further episodes of urinary incontinence since the previous evening. An outpatient MRI of his cervical and thoracic spine was ordered, and Hill received a prescription for oral steroids, "just in case there is any slight amount of cord swelling contributing to [his] symptoms." (*Id.*)

The MRI of Hill's lumbosacral spine was performed on March 29, 2006. The study revealed "no significant abnormality . . . down to and including L3-4"; "mild degenerative changes in the facet joints bilaterally and a minimal diffuse bulge of disc material" at L4-5; and "moderate degenerative disc disease" at L5-S1, with "a fairly diffuse bulge of disc material and associated marginal osteophytes resulting in some narrowing of the neural foramina bilaterally" at that level. (A.R. 518) Notes indicate Hill's exam was "unchanged in appearance compared to the previous study of February 9, 2006." (*Id.*)

On April 26, 2006, Hill received a physical therapy treatment and attended a fibromyalgia class. (A.R. 22-24) Later in the day,

15 - FINDINGS & RECOMMENDATION

he saw family practitioner David H. Lee, M.D. at Kaiser, for a complaint of worsening low back pain since his physical therapy treatment.  Hill described "sharp low back pain with radiation to [his] abdomen." (*Id.*)  He was noted to have decreased flexion to 45 degrees and extension to 10 degrees, with mild muscle spasms in his spine.  He was treated with a Toradol injection, and given a prescription for Flexeril to use as needed.  (*Id.*)

On May 1, 2006, Hill saw family practitioner Andreas Wolf, M.D. at Kaiser, for followup of his low back pain.  He received a Toradol injection for breakthrough pain, with instructions to follow up with Dr. Custino. (A.R. 421)

Hill attended pain management classes on May 10, 17, and 25, 2006.  He was instructed in deep breathing, relaxation, and stretching exercises; the nature of chronic pain, and the effects of stress on pain; techniques for coping and dealing with pain and stress; and available reading and other resources.  (A.R. 419-20)

Hill attended physical therapy on May 22, 2006, reporting that his pain was worse.  He stated he was working as much as possible, given his condition.  His home exercise program was reviewed, and walking on a treadmill was added, for five minutes per hour while wearing a TENS unit.  The therapist noted that at times when Hill complained of increased pain, he exhibited "no signs of altered motor function or change in gait pattern." (*Id.*)  The therapist indicated Hill needed to be active to have any hope of recovery, but Hill stated he was "literally paralyzed by the pain." (*Id.*) The therapist recommended ongoing use of a TENS unit, as well as "cognitive behavioral therapy." (*Id.*)  She noted Hill's

16 - FINDINGS & RECOMMENDATION

progression likely would be "very slow," given the length of time he had had chronic pain. (A.R. 420)

On May 31, 2006, on referral from Dr. Custino, Hill saw neurosurgeon Mitchell A. Weinstein, M.D. for a second opinion regarding his back pain, and consultation regarding pain management. Examination of Hill's spine showed "no evidence of radiculopathy," and no "surgically significant" pathology was evident on Hill's MRIs. (A.R. 416) The doctor noted Hill displayed "[s]ome pain behavior." (*Id.*) From the doctor's examination of Hill and review of his records, he diagnosed Hill with "[c]hronic pain secondary to back pain following MVA and Fibromyalgia with unsatisfactory pain control." (A.R. 418) He recommended discontinuing the use of any short-acting opioids, which he indicated could diminish the effectiveness of long-acting opiates. He suggested a gradual increase of Oxycontin up to 20 mg. every eight hours, with further increases as needed to be prescribed by Hill's regular doctor. He also advised reduction of Hill's Clonazepam to avoid excessive sedation. He recommended Hill consider several acupuncture visits, although they were not covered by his health plan, and he advised Hill to continue attending the Pain Management Group to learn therapies and strategies to help manage his chronic pain. (*Id.*)

Hill attended the Pain Management Group on June 1, 2006. He had been trying some coping strategies at home, including relaxation, deep breathing, talking about his pain with his family, and using ice. The group discussed "pacing"; ways to redesign tasks and the environment; time management strategies; and ways to improve sleep. (A.R. 415)

17 - FINDINGS & RECOMMENDATION

Hill attended a Pain Management Group session on June 15, 2006. He reported starting a new pain medication that had caused him to develop a rash, resulting in a switch to Fentanyl patches. He was trying some meditation tapes and finding them helpful. Hill was noted to appear "painful, grimicing [sic] and pacing in back of room." (A.R. 415)

Hill was seen in the ER on June 16, 2006, for itching that had occurred in connection with starting Dilaudid for an exacerbation of his chronic back pain. The Dilaudid was discontinued, and he had started a Fentanyl patch, but developed additional itching. He took some Benadryl and obtained some relief, and then went to the ER for evaluation. He denied any chest pain or shortness or breath. He remained stable in the ER, and was discharged with directions to continue taking his prescribed medications, adding Benadryl as needed. (A.R. 361-62)

Hill attended a Pain Management Group session on June 22, 2006. He was noted to be alert and interested, and in no obvious discomfort. Hill indicated his pain was not well controlled. He completed a "depression screening tool," indicating his mood was depressed; he had "[m]arkedly diminished interest or pleasure in all or almost all activities"; he had trouble sleeping and felt agitated; he experienced problems with concentration and decision-making; and he felt fatigued and had loss of energy. (A.R. 414) The group discussed problem-solving and coping skills in relation to a variety of situations. (*Id.*)

Hill had a physical therapy treatment on June 23, 2006. He reported that his leg pain had "settled down," but he continued to "have quite a bit of pain with awkward positions at work." (A.R.

18 - FINDINGS & RECOMMENDATION

413)  Hill exhibited moderate loss of range of motion of his low back on flexion and extension, worse with repetitive motions.  He was instructed in the use and care of a TENS unit, and his home exercise program was reviewed.  (*Id.*)

Hill attended a Pain Management Group session on July 6, 2006.  (A.R. 412)  He appeared to be in "no obvious discomfort."  (*Id.*)  A treatment planning session was scheduled, and Hill was instructed in a self-hypnosis exercise.  He also received information about complementary health care modalities that, although not available through Kaiser, could be helpful in managing chronic pain.  These included massage, acupuncture, chiropractic, naturopathy, and Ayurvedic medicine.  (A.R. 413)

Hill was admitted to the hospital through the ER on July 8, 2006, complaining of "increased weakness in his legs and question of urinary incontinence."  (A.R. 353)  He also had "some numbness and tingling in his right foot and toes and feeling of numbness in his buttock."  (*Id.*)  Hill reported his low back pain had been 7-8 on a 10-point scale, and he was taking oxycodone for the pain.  (*Id.*)  MRIs "showed a cervical disk bulge but no evidence of spinal cord compression, and also, his lumbosacral spine showed a broad-based L5 compression but no evidence of abnormality involving the spinal cord or the cauda equina."  (A.R. 354; *see* A.R. 519-20)  Hill was discharged the next day with directions for bed rest, and use of his prescribed pain medications.  (*Id.*)

On July 11, 2006, Hill saw Dr. Custino for followup of the ER visit.  Hill was referred to an anesthesiologist for an epidural steroid injection.  He also received a prescription for a

19 - FINDINGS & RECOMMENDATION

prednisone taper. (A.R. 412)  On July 13, 2006, Hill met with a nurse in the Pain Group to develop a treatment plan.  (A.R. 411)

Hill was seen in the ER on July 15, 2006, for a thumb laceration.  He had been "doing some watering," and cut himself on a sharp piece of metal.  (A.R. 351)  The wound was explored, cleaned, and stitched.  Notes indicate Hill could "pursue normal work as long as he protect[ed] the wound."  (A.R. 352)

Hill saw Norman Freeman, M.D. on August 1, 2006, for evaluation of "several symptoms following a motor vehicle accident" that occurred in May 2005.  (A.R. 408)  Hill reported persistent low back and right leg pain, spiking at times.  During spikes, Hill's legs sometimes became weak and gave way, and he sometimes had bladder or bowel incontinence.  He also had transient numbness in his hands and legs at times. (A.R. 409)  He also described ongoing pain problems relating to two previous motor vehicle accidents, and ongoing fibromyalgia with pain that jumped "all around," affecting, at times, his shoulders, back, and legs.  (A.R. 408)  Hill also described some memory and concentration problems, which he attributed to his pain, medications, and/or depression. (A.R. 409)  The doctor reviewed four MRI scans of Hill's lumbar spine, done on February 9, March 6 and 29, and July 9, 2006, and notes from two neurosurgical consultations, neither of which resulted in a recommendation for surgical intervention.  Treatment had included long-acting oxycodone, which Hill stated helped his pain somewhat, and three epidural steroid injections, which Hill stated gave him 10% to 20% relief for a period of time.  (*Id.*)  Dr. Freeman ordered "electrodiagnostic studies, particularly to obtain more evidence

about . . . questionably relevant findings at L5-S1 on the right."
(A.R. 410)

On August 14, 2006, Hill saw Shobana Rajagopal, M.D. at Kaiser for complaints of GI symptoms.  Prilosec was no longer helping his symptoms enough, and he had pain and nausea, "waking up in the mornings [with] stomach acid in his nose."  (A.R. 407)  These symptoms, together with worsening psoriasis symptoms, were increasing his stress.  A "GI cocktail" was administered, and Hill reported feeling much better afterward.  The doctor recommended a trial of Protonix, noting it appeared Hill's symptoms were heart-burn-related.  Hill was referred to the GI Clinic for an endoscopy. (*Id.*)

On August 17, 2006, Hill saw James Y. Kim, M.D. at Kaiser for followup of his low back pain.  Hill reported that his pain was radiating to the perineum and down his right leg, and sometimes he experienced weakness and intermittent numbness in that leg.  The doctor found "no good evidence for a radiculopathy or a pelxopathy [sic][6]."  (A.R. 406)  He found Hill's "borderline values seen in

---

[6]This typographical error refers to "plexopathy," which is a "[d]isorder involving one of the major peripheral neural plexuses: cervical, brachial, or lumbosacral."  STEDMANS 321700 (on Westlaw), Stedman's Medical Dictionary (27th ed. 2000).  It has been described as "a disorder affecting a network of nerves, blood vessels, or lymph vessels," with symptoms including "pain, loss of motor control, and sensory deficits."  www.en.wikipedia.org/wiki/ Plexopathy (visited 11/13/12).

1  the NCV are most likely related to a cool limb."[7]  (*Id.; see* A.R.
2  482-84)

3      Hill saw Dr. Custino on September 19, 2006, for followup of
4  his chronic back pain.  Hill reported that he was "building some
5  tolerance to his oxycodone regimen . . . finding himself using more
6  short-acting oxycodone to get pain control."  (A.R. 406)  His
7  oxycodone SR was increased to 80 mg. twice daily, and Hill signed
8  a pain contract and submitted to a urine drug screen.  Hill stated
9  he  had  seen  a  neurosurgeon  outside  the  Kaiser  system  for
10 consultation, and the surgeon had recommended back surgery, which
11 Hill planned to have later in the year.[8]  (*Id.*)

12     On September 25, 2006, Hill saw Katherine M. Hoda, M.D. at
13 Kaiser  for  followup  of  chronic  back  pain  and  GERD.   He  was
14 scheduled for an EGD to evaluate his ongoing GERD symptoms despite
15 proton pump inhibitor therapy.  (A.R. 403-04)

16     Hill went to the ER on October 6, 2006, stating he thought he
17 was having an allergic reaction to oxycodone, which he had been
18 taking for his back pain.  He had developed an itchy facial rash
19 and was somewhat wheezy.  He was allergic to several narcotic
20 medications already, and was concerned he might develop an anaphy-

21

22     [7]This finding refers to the relationship between the tempera-
23 ture of a limb and nerve conduction velocity (NCV).  If the limb
   temperature is cool or cold, the results of the NCV study can be
24 skewed.  *See, e.g.,* http://www.ncbi.nlm.nih.gov/pubmed/15224815,
   "The relationship between temperature and neuronal characteristics"
25 (visited 11/13/12).

26     [8]In exam notes dated November 21, 2006, Richard S. Polin, M.D.
   noted that Hill "provided a letter from Dr. Brett - a neurosurgeon
27 in the community wanting to proceed with a L5-S1 fusion procedure."
   (A.R. 398)  However, Dr. Polin indicated "that without a discogram
28 [he] would not even consider such a procedure."  (*Id.*)

22 - FINDINGS & RECOMMENDATION

lactic reaction.   Doctors opined the rash was "more of a hyper-
sensitivity reaction versus a histaminic release from his high
doses of narcotics." (A.R. 346)  He was treated with I.V. Benadryl
and Pepcid, and an albuterol nebulizer.   Hill's symptoms improved
significantly, and he was released, with directions to take a
Benadryl with each dose of the oxycodone, and follow up as needed
with his primary care physician.  (*Id.*)

     Hill saw Dr. Custino on October 10, 2006, "for pain management
discussion." (A.R. 403)  Hill stated Vicodin had caused his mouth
to itch.  He was on Lidoderm patches, but still rated his pain at
8/10.  Tylenol with codeine was prescribed, and Hill also was given
prednisone to take if the Tylenol with codeine caused an adverse
reaction.  (*Id.*)

     On October 14, 2006, at 2:53 p.m., Hill presented to the ER
for an unknown reason, but then left against medical advice before
being seen.  (A.R. 350)

     Hill saw Randy D. Kreps, M.D. at Kaiser on October 18, 2006,
for consultation, at Dr. Custino's request, regarding treatment of
Hill's lumbar pain and right lower extremity pain.  Hill described
his pain as being "in the right side of the lumbar area, radiating
down the buttock, down the posterior thigh, occasionally below the
right knee."  (A.R. 402)   Notes indicate Hill had developed
allergies  or  significant  adverse  reactions  to  most  pain
medications, including Fentanyl patches, all oxycodone derivatives
and Oxycontin, extended-release morphine, Tylenol #3, Vicodin, and
Relafen and Lodine NSAIDs.  Hill was currently working part-time,
but previously worked full-time in heating and air conditioning.
He was taking Clonazepam at night to sleep, Prozac for depression,

23 - FINDINGS & RECOMMENDATION

Protonix for GERD, and Lipitor for hypercholesterolemia.  (*Id.*)
The doctor recommended Hill join a chronic pain therapy group to
learn different strategies for dealing with his chronic pain.  He
started Hill on a trial of methadone, and indicated that once Hill
had stabilized on a chronic medicine plan, he could have nerve
block therapy with epidurals or facet blocks.  (*Id.*)

On October 24, 2006, Hill saw Priscilla Butler, M.D.,
reporting a reaction to long-acting morphine.  Several hours after
taking the drug, Hill had developed hives; itching in his mouth,
throat, and ears; and swelling around his eyes.  He had no
wheezing, shortness of breath, or fainting.  He had taken a
Benadryl and 5 mg. of prednisone, which had relieved some of his
symptoms.  He was directed to go to the ER if his symptoms
worsened.  (A.R. 400-01)  Hill went to the ER at 7:16 p.m. that
evening, but left  ("eloped from triage") against medical advice
before being seen.  (A.R. 344)

On November 8, 2006, Hill saw Kenneth M. Ettinger, M.D. at
Kaiser, on referral from Dr. Custino, for "discussion regarding a
reaction to Morphine and other Opiates." (A.R. 400)  Hill reported
that he could "tolerate very small amounts of oxycotin [sic],
repeatedly, during the day without adverse reaction." (*Id.*)  He
had "noted a mark[ed] reduction in back pain" since beginning a
course of oral prednisone. (*Id.*)  After reviewing Hill's history
of reactions to various pain medications, the doctor concluded
administration of any opiates to Hill would cause significant risk.
Hill was given an Epipen, and instructed in its use. (*Id.*)

On November 15, 2006, Hill saw Dr. Kreps for followup of his
chronic pain.  Hill reported persistent right lumbar pain about 80%

24 - FINDINGS & RECOMMENDATION

of the time, and intermittent pain in his left lateral thigh about
20% of the time.  He was referred to physical therapy in the Pain
Clinic, with a note that Hill "may need job change."  (A.R. 399)
A trial of Trazodone 25 mg. was prescribed for use at night, to aid
with sleep.  Hill saw a physical therapist the same day for
adjustment of "current [as needed] bracing"; instruction in a daily
self-care routine including heat, ice, stretching, posture, and
sleep positioning; and consideration of other potentially bene-
ficial therapies.  (*Id.*)  The therapist suggested that considera-
tion of a "work conditioning/work hardening" program or vocational
rehabilitation would be appropriate "if/when [Hill's] pain is more
effectively managed."  (*Id.*)  Notes indicate Hill had had
"[p]otentially life-threatening reactions to opiod [sic] pain
medications." (*Id.*)

Hill saw Terry L. Davis, M.D. on November 17, 2006, with a
complaint of low back pain.  Hill stated he was in pain and wanted
"something done."  (A.R. 398)  A toradol shot had made him sleep
for three days, and he was unable to take opiates.  Hill had not
tried propoxyphene, codeine, tramadol, or Talwin, but the doctor
indicated those medications "may not be strong enough." (*Id.*)  He
indicated, "Perhaps some analgesia would be better than none."
(*Id.*)

On November 21, 2006, Hill returned to see neurosurgeon
Richard S. Polin, M.D.  The doctor noted the following:

> The patient returned basically to bully and
> try to intimidate me into providing an outside
> referral for surgical services.  He has back
> and leg pain stemming from an MVA in 05.  He
> was seen by both Dr. Weinstein and myself who
> felt his findings were minimal and he would
> best benefit from physiatry but he never kept

those appts.  He also carries a [diagnosis] of fibromyalgia.  He was eventually seen by physiatry for an EMG which was negative.  Tellingly - he admitted as documented by Dr. Kim that had he known the results were going to be negative he would have terminated the procedure.  In short he knows enough to understand that a negative EMg. is excellent evidence that there is not ongoing physical nerve root compression causing his alleged non-dermatomal back and leg pain.  He has had myriads of complaints of back and leg pain as well as intermittant [sic] incontinance [sic]. Multiple MRIs have been the same showing a mild disc degeneration at L4-5 and L5-S1 and a minimal L5-S1 bulge - nothing to explain his symptoms.

He provided a letter from Dr. Brett - a neurosurgeon in the community wanting to proceed with a L5-S1 fusion procedure.  I told him that without a discogram we would not even consider such a procedure.

At this point I offered him an opinion with Dr. Oppenheimer who is capable of doing both discograms and the surgery.  He became highly aggitated [sic] and said we were all in cahoots and he didn't want to see Dr. Oppenheimer.  He reiterated that what he wanted was an outside referral to Dr. Brett and Dr Nash. I told him that because these were procedures done with[]in our department - we could not grant an outside referral and once again offered Dr. Oppenheimer.  As an alternative I told him he could request outside service from member relations.

He again refused.  I felt physically threatened during this encounter and at one point actually opened the door to be able to make a quick escape.

I did not have a chance to examine Mr. Hill but spent over 20 minutes in counseling and discussion.

(A.R. 398)

On December 31, 2006, Hill went to the ER with complaints of palpitations, chest pain, and bigeminy, beginning around 4:00 p.m. that afternoon.  He also felt lightheaded, and reported pain

26 - FINDINGS & RECOMMENDATION

radiating down his left arm. (A.R. 337) A chest x-ray was normal. EKG showed bigeminy, "with the distance in between perfused beats around 38 or so." (A.R. 338) He was treated with nitroglycerin and "nitro paste," which significantly improved his symptoms. Hill declined admission to the hospital, and was discharged to home "with close followup." (A.R. 338)

Hill saw Dr. Custino on January 10, 2007, with a complaint of heart palpitations, low back pain, and an episode of fecal incontinence two days earlier. The doctor ordered a cardiac event monitor, and referred Hill to the Rectal Clinic for further evaluation. (A.R. 397)

Hill was seen in the ER on January 19, 2007, with a complaint of chest pain and palpitations that began around noon that day. He stated "he started feeling somewhat anxious with more tightness in his chest and then numbness in his left arm and began feeling somewhat diaphoretic as well." (A.R. 332) Hill also complained of shortness of breath, and lightheadedness and dizziness. A screening x-ray was normal. Notes indicate Hill historically had "some ectopy on his EKG." (A.R. 333) Doctors opined Hill was "having a significant amount of anxiety associated with the onset of his PVCs and bigeminy," likely with some chest pain. (*Id.*) They did not feel any further workup was warranted. Hill was advised if similar symptoms occurred in the future, it would be reasonable for him to take an additional Klonopin and allow himself to rest, following up with his regular doctor later. (*Id.*)

Hill saw Dr. Custino on January 26, 2007, for followup of his ER visit. He was directed to continue on his current medications, and follow up in about six months for repeat lab tests to check his

27 - FINDINGS & RECOMMENDATION

liver function, lipid profile, and blood sugar.  Notes indicate Hill's cholesterol had been significantly reduced with the use of Lipitor.  (A.R. 395-96)

On February 14, 2007, Hill saw Kimberly M. Kaplan, M.D. at the Oregon Health & Science University Comprehensive Pain Clinic for evaluation.  Hill indicated his worst pain was located in his lower back, lumbar spine, and sacrum, with radiation into his lower limbs.  He was sleeping about five hours at night, with his sleep disturbed due to pain, "anxiety/tension," and difficulty relaxing. (A.R. 511)  Hill's goals were "[h]elp in coping with the pain, [a] reduction in pain and [a] cure."  (*Id.*) He was started on a trial of Lyrica 50 mg./day, to be increased to 75 mg./day.  He also was started on a course of physical therapy.  He was advised that if conservative management did not help his pain, then he should schedule a diskogram.  (A.R. 514; *see* A.R. 511-16)

On March 23, 2007, Hill saw Dr. Kaplan for followup of his chronic pain.  He was directed to continue on Lyrica therapy, increasing his dosage to 100 mg. once daily.  Physical therapy also was prescribed.  (A.R. 485)

On April 4, 2007, Hill saw a physical therapist for therapy in connection with his complaints of low back and right leg pain. Hill had been to therapy previously, but had been unable to do the maneuvers "due to his high level of pain."  (A.R. 393)  He was on new pain medication, Lyrica, that he reported had "lowered his symptoms from a 7/10 to a 4/10 on the average."  (*Id.*)  Hill stated he had pain with all activities and postures, and pain affected his activities of daily living, sleep, and ability to work.  On evaluation, Hill evidenced "forward head and rounded shoulders,"

28 - FINDINGS & RECOMMENDATION

and "thoracic kyphosis [i.e. curvature of the thoracic spine]." (*Id.*)  He was "very tender" to palpation at the L5-S1 level on the right.  He was instructed in a home exercise plan to help relieve his symptoms, and a treatment schedule was initiated, with Hill to receive therapy once weekly for eight weeks, with modalities including "therex, core and neutral spine stabilization." (A.R. 394)  The plan was reviewed and approved by Dr. Custino. (A.R. 392)

Hill went to the ER on April 5, 2007, with complaints of numbness, increased right-sided back pain radiating down into his right leg, and weakness, following physical therapy the day before. Hill stated his right leg was "turning numb and . . . increasing in pain." (A.R. 327)  His patellar reflexes were intact bilaterally. Leg raise strength, knee flexes and extensions, and plantar flexion and dorsiflexion, all were 5/5 bilaterally.  (A.R. 328)  A course of oral steroids was prescribed, and Hill was discharged home in stable condition.  (*Id.*)

Hill was seen in the ER on April 10, 2007, with a complaint of back pain with "some incontinence," caused by his inability to get to the bathroom in time due to his pain.  An MRI of Hill's lumbar spine showed "some bulging of L5-S1 disk, more on the right than the left, consistent with the symptoms, but no midline impingement and no evidence of cauda equina syndrome." (A.R. 323; *see* A.R. 524-25)  He was diagnosed with "[r]ight leg radiculopathy," and "L5-S1 bulging disk." (A.R. 324)  He was referred "to Kaiser," with the doctor's notes indicating Hill likely would "need neuro-surgical or back surgery referral." (*Id.*)

29 - FINDINGS & RECOMMENDATION

On April 11, 2007, Hill saw Dr. Kaplan at the Pain Clinic for followup. Hill reported continuing lumbar pain with right radiculopathy. He had experienced an exacerbation after a physical therapy session on April 3, 2007, followed by leg numbness and some incontinence on April 6, 2007. He stated his pain was made worse by driving, and by constant walking, and improved only slightly with morphine. An MRI performed the previous day showed "no significant findings." (A.R. 487) His current medications were listed as Lyrica 75 mg./day; Klonopin 2 mg., 1/2 tablet twice daily; Soma 350 mg., one tablet three times daily and at bedtime; Lipitor 20 mg./day; Prozac 20 mg., two tablets/day in the morning; Lidocaine 4% patch for breakthrough pain; and Tylenol 325 mg., one tablet every four hours as needed. (A.R. 488) His Lyrica was increased to 150 mg./day, and Tylenol was increased to 500 mg. four times/day. Notes indicate Hill could receive an epidural steroid injection at his request. (A.R. 489)

Hill was admitted to the hospital through the ER on May 2, 2007, for "atypical chest pain." (A.R. 314) He had felt lightheaded after coming home from work, with some palpitations and chest pressure. Upon talking with the doctor, Hill noted he had only eaten a bagel and had a cup of coffee the entire day. The doctor thought Hill's lightheadedness was "probably secondary to dehydration and not having eaten anything except a bagel all day long." (*Id.*) EKG, chest x-ray, and labs were normal. His chest pain was thought to be due to anxiety, rather than any heart problem. He was discharged the next day with no changes to his medications. (A.R. 315)

1   Hill returned to see Dr. Kaplan at the Pain Clinic on May 16,
2   2007.  He reported intermittent episodes of leg weakness, but
3   otherwise no new pain complaints.  The doctor prescribed a trial of
4   Topamax (an anti-convulsant, also used for pain management), 50 mg.
5   twice daily.  (A.R. 492-94)

6   Hill saw Dr. Custino on June 7, 2007, with a complaint of
7   dizziness with associated blurry vision in his left eye.  Hill
8   stated he recently had started Topamax and amitriptyline (an
9   antidepressant), and he had a pending appointment with a psychia-
10  trist to see if his antidepressant should be changed.  Dr. Custino
11  suspected Hill might suffer from a somatization disorder, given his
12  previous negative workups for cardiac problems.  (A.R. 391-92)  He
13  started Hill on citalopram (an antidepressant).  (A.R. 392)

14  On July 29, 2007, Hill was seen in the ER with a complaint of
15  chest pain, pressure, and tightness for several hours, radiating
16  down his left arm.  Hill complained of "severe back pain," for
17  which doctors "at the University" had recommended surgery, but
18  "Kaiser" would not approve the surgery.  (A.R. 309)  Hill stated
19  that because he was unable to take narcotics, this left him
20  "suffering with this back pain that is about a 7/10 at all times."
21  (*Id.*)  An EKG, screening labs, and a chest x-ray all were normal.
22  Hill was treated with nitroglycerin and Ativan, which resolved his
23  atypical chest pain.  (A.R. 310)

24  On July 31, 2007, Hill saw Dr. Custino for followup after his
25  ER visit two days earlier.  Hill stated he was taking nitroglycerin
26  to relieve chest pain, and he usually got relief from taking "up to
27  3 five minutes apart."  (A.R. 389)  Hill was referred to a
28

31 - FINDINGS & RECOMMENDATION

cardiologist for followup, with instructions to continue on his current medications. (*Id.*)

Hill saw cardiologist Alison Fulmer, M.D. on August 1, 2007, with a complaint of increasing PVCs. The doctor prescribed a trial of verapamil "to avoid beta blocker side effects," but she noted the medication might not be effective. (A.R. 388)

On August 8, 2007, Hill saw Hirohisa Ono, M.D. for consultation regarding possible surgery for Hill's displaced lumbar intervertebral disc. The doctor explained the surgical procedure, and its risk and possible complications. (A.R. 387) Dr. Ono explained that because Hill's displaced disk was "so small, the chance of making him better by doing surgery [was] only a 70%-75% chance as compared to 80%-90% chance for a large-size disk herniation case." (A.R. 388) X-rays were taken of Hill's lumbosacral spine on August 13, 2007, showing "mild degenerative changes present diffusely and mild to moderate degenerative changes present at the L5-S1 level," but [n]o significant degree of instability." (A.R. 528) Dr. Ono recommended trying another epidural steroid injection, noting Hill had received similar injections three times in 2005, with mild relief. (*Id.*) Hill received the steroid injection from Ron H. Ruff, M.D. on September 24, 2007. (A.R. 504-05) The doctor's notes do not indicate whether the injection reduced Hill's pain, merely indicating the doctor would "contact him in 72 hours." (A.R. 505)

Hill saw Priscilla Butler, M.D. on October 9, 2007, for followup of palpitations. Hill stated he had been to the ER for palpitations in the previous few days, but the wait was too long so he had come to the clinic instead. He complained of palpitations

with pain radiating down his arm, and increasing panic attacks with shortness of breath. The doctor increased Hill's verapamil dosage for his irregular heartbeat. She noted Hill's chronic pain was "not controlled," and suggested he might consider increasing his dosage of Lyrica. She directed him to follow up with the Pain Clinic. She noted Hill's panic disorder aggravated both his pain and his palpitations. She directed him to continue with his current treatment regimen (medications and therapy). (A.R. 386)

Hill was taken to the ER by ambulance on October 21, 2007, with a complaint of left-sided chest pain for two hours, radiating up into his jaw rather than down into his left arm as in the past. He was somewhat nauseated and sweaty, but had no fever. Nitro-glycerin eventually resolved Hill's pain. Notes indicate that in the past, when Hill's back pain was elevated, it caused some anxiety, which then caused his chest pain. Doctors believed this was the cause of his current chest pain, as well. He was directed to follow up with his primary care physician. (A.R. 304-08)

Hill was seen in the ER on October 26, 2007, for a complaint of "palpitations of about 2 days' duration." (A.R. 300) Notes indicate Hill had experienced similar symptoms multiple times in the past, and had been seen by a cardiologist. Hill also had "some chronic back pain from an injury 2 years ago which unfortunately had been refractory to most medical management at this point." (*Id.*) Hill was concerned that his chronic back pain was "stressing his heart and [was] the etiology of his palpitations." (*Id.*) He also had mild, left-sided, dull, intermittent chest pain. Hill was using lidocaine patches for his pain, with notes indicating that due to "multiple allergies," he had been unable to use anything

else.  (*Id.*)  An EKG showed PVCs.  He was treated with oral Ativan.
Doctors felt his chest pain was "atypical in nature," and did not
warrant further workup.  (A.R. 301)

Hill went to the ER on October 28, 2007, complaining of chest
pain and palpitations.  Notes indicate he had been worked up for
similar symptoms "many times," having also been seen in the ER on
October 21 and 26, 2007, for the same complaints.  (A.R. 297)  An
EKG was normal.  The doctor indicated Hill's recurring symptoms
seemed to be "worsening his depression."  (A.R. 298)  A mental
health worker consulted with Hill and "gave him some other
referrals."  (*Id.*)  Hill was directed to follow up with his mental
health provider and primary care physician.  (*Id.*)

Hill was seen in the ER on October 30, 2007, with a complaint
of "irregular palpitations in his left lateral chest accompanied by
some pain and tightness throughout his chest and back, and
intermittently . . . a secondary twitching in the left side of his
face . . . 4-5 times per hour."  (A.R. 289)  An EKG was "within
normal limits except for premature ventricular contractions."
(*Id.*)  The doctor noted this condition had "been thoroughly worked
up" in the past.  When he mentioned this to Hill, Hill stated,
"[B]ut I can never be 100 percent sure there is nothing wrong with
my heart, so I keep coming back."  (*Id.*)  The doctor advised Hill
that "as long as the symptoms are simply those of palpitations in
the chest [with] pain radiating from his back," he should just
follow up with his primary care physician.  (*Id.*)  His discharge
diagnoses were "chronic chest and back pain, as well as premature
ventricular contractions," and "[d]epression and anxiety."  (A.R.
292-93)

34 - FINDINGS & RECOMMENDATION

1   Hill was admitted to the hospital through the ER on
2   November 3, 2007, due to complaints of lightheadedness and dizzi-
3   ness "that would progress into a spinning sensation almost
4   vertiginous in nature." (A.R. 271) His dizzy spells continued for
5   four days. An MRI of his brain, and CT scans of his head and neck,
6   were normal. (*Id.*; A.R. 281-88; *see* A.R. 529-30) Notes indicate
7   Hill recently had been started on a new medication, verapamil, for
8   angina. His symptoms began to improve somewhat when the medication
9   was stopped, and it was removed from his medication regimen. He
10  was noted to have a history of ventricular bigeminy, and doctors
11  believed his symptoms were related to this. They noted that if
12  Hill could not tolerate a beta-blocker, then he might need to
13  consider a pacemaker if his dizziness continued. (A.R. 271-72)

14   Hill was scheduled for release from the hospital on
15  November 7, 2007, but he became dizzy when he stood up to get into
16  the wheelchair. He was kept in the hospital while doctors tried
17  reintroducing the verapamil, at a lower dose, titrating upward.
18  The medication failed to resolve Hill's symptoms. A cardiologist
19  and an electrophysiologist were consulted, and they indicated
20  neither medication nor a pacemaker was likely to improve Hill's
21  condition. The doctors made the following recommendations:

22              Therefore, the recommendation was that the
                patient try and drink fluids to keep himself
23              well hydrated. Should he start to have any
                episodes of lightheadedness, he can increase
24              his activity by swinging his arms or walking
                more quickly, which is difficult for this
25              patient to do, secondary to his back problems.
                Increasing his heart rate oftentimes will
26              decrease the amount of PVCs. I have relayed
                this information to the patient and he does
27              understand this. He states he does drink a
                large amount of fluids, usually, when he is at
28              home. He always has a bottle of water with

35 - FINDINGS & RECOMMENDATION

1
2
3
4
5
6

him, indicating that he may very well have
realized that the fluid balance is of benefit
to him to prevent his symptoms in the past,
subconsciously, and already drinks a lot of
fluids for this reason.    I have also
recommended that the patient follow up with
neurosurgery, as it does not appear he is
getting adequate control of his back pain.
The epidural injections do not seem to help.
Therefore, his likely only route of management
at this point would be surgery.

7  (A.R. 272-73)  Hill was discharged on November 9, 2007.  (A.R. 273)

8      On November 28, 2007, Hill returned to see Dr. Ono in the

9  Kaiser Neurosurgery Clinic, asking the doctor to review "the MRI

10  scan which was done at St. Vincent Hospital, although [Hill] [did]

11  not know exactly when."  (A.R. 384, 454)  Hill complained that his

12  back pain had gotten worse, and now was radiating down to his right

13  buttock area.    On examination, he had a negative straight-leg-

14  raising test and no hip pain on flexion, abduction, or rotation,

15  but he had "decreased light touch sensation in the right anterior

16  thigh, right middle aspect of the calf, and the lateral aspect of

17  the right foot."  (*Id.*)  The doctor obtained results from an MRI

18  scan in March 2006, which only showed "a very, very small herniated

19  nucleus pulposus at the L5-S1 space."  (*Id.*)  He ordered a new MRI

20  scan to evaluate Hill's current condition.  (*Id.*)

21      Hill was seen in the ER on December 5, 2007, with a complaint

22  of chest pain.  Hill stated he had become dizzy and developed chest

23  pain in the mid-afternoon, with the pain radiating into his left

24  arm and neck.    He also reported some palpitations and light-

25  headedness.    An electrocardiogram was normal, as were lab tests.

26  He was diagnosed with atypical chest pain.    The doctor opined

27  Hill's chest pain was not cardiac in origin.  (A.R. 268-69)

28

36 - FINDINGS & RECOMMENDATION

Hill saw P.A. Jean-Luc Gustin at a Kaiser clinic on December 10, 2007, with a complaint of right wrist pain and tingling in the little finger of his right hand following a slip-and-fall accident earlier in the day.  X-rays revealed no fracture.  Hill was diagnosed with a wrist sprain or strain, and was treated with a wrist brace.  (A.R. 383; *see* A.R. 532, 589)

On December 13, 2007, Hill talked with a psychiatric social worker for followup of his panic disorder and depression.  He complained of panic symptoms and feelings of hopelessness due to the "continued extreme pain in his back."  (A.R. 588)  He was using ice and breathing techniques in addition to his pain medications.  He continued to have panic attacks.  The counselor described Hill as "highly distressed."  (*Id.*)  She discussed ways for Hill to cope during the upcoming holidays.  He was scheduled for telephonic followup in one week.  (*Id.*)

Hill had another telephonic counseling session on December 20, 2007.  Hill stated he continued to have severe pain that prevented him from moving around, and caused his sleep to be poor.  He stated he was "desperate" for some relief from the pain, and was hoping for a referral to physical therapy and acupuncture.  He complained of depressed mood, poor concentration, and negative thoughts.  He was scheduled for telephonic followup in two weeks.  (A.R. 587-88)

An MRI of Hill's lumbosacral spine on December 26, 2007, showed only minimal changes from Hill's March 29, 2006, MRI.  He continued to have mild narrowing of the bilateral neural foramina, and mild degenerative changes, at the L4-L5 level; and, at the L5-S1 level, "[i]n conjunction with moderate bilateral facet hypertrophic degenerative changes, asymmetric moderate narrowing of

37 - FINDINGS & RECOMMENDATION

1  right greater than left neural foramina," with "[n]o nerve root
2  impingement."  (A.R. 533, 599)

3      Hill received an acupuncture treatment on January 8, 2008.
4  The practitioner also recommended some herbal over-the-counter
5  products that might be helpful.  (A.R. 586-87, 595)

6      Hill saw Dr. Custino on January 17, 2008, for followup of his
7  chest pain.  Notes indicate Hill's chest pain was "very much in
8  relationship to his back pain." (A.R. 583-84)  He was referred to
9  neurosurgery for followup with Dr. Ono; continued on his lidocaine
10 patches and Lyrica; and referred to a dermatologist for management
11 of his psoriasis. (*Id.*; 594-95)

12      Hill received physical therapy on January 17 and 24, 2008, for
13 his diagnosis of lumbar radiculopathy. (A.R. 582-83, 584-86)  Hill
14 had been unable to begin pool therapy due to psoriasis, which was
15 under a doctor's care.  He complained of increased pain in his
16 right leg on seated flexion and when prone on his elbows.  He was
17 treated with gentle movements, ice packs, and massage.  (*Id.*)

18      On January 29, 2008, Hill saw Dr. Custino for followup of
19 right lower quadrant pain.  Notes indicate Hill had received a
20 complete workup and CT scan in the ER on January 25, 2008, but no
21 definitive cause of his pain was determined.  Hill was still having
22 the pain, but it had improved somewhat.  He noted the pain was
23 better with rest and ice, and worse with movement.  He had been
24 given sublingual Fentanyl and oral Dilaudid in the ER, with some
25 improvement.  Dr. Custino suspected Hill's pain could be "related
26 to hip flexor strain," rather than due to any intra-abdominal
27 process such as appendicitis.  He directed Hill to continue with
28

38 - FINDINGS & RECOMMENDATION

1  rest, ice/heat, and "avoidance of repetitive overuse." He also
2  refilled a prescription for Dilaudid. (A.R. 581-82, 593-94)

3      On February 21, 2008, Hill saw psychiatrist Per Sweetman, M.D.
4  for followup of his depression. Hill had experienced recent
5  situational stressors including foreclosure of his home. He had
6  been more depressed and anxious. In addition, his chronic pain
7  continued, which the doctor noted had exacerbated both his panic
8  disorder and his depression. The doctor increased Hill's Prozac
9  and Klonopin dosages, and directed Hill to follow up in four to six
10  weeks. (A.R. 579-80)

11      Hill saw Dr. Custino on February 29, 2008, for complaints of
12  chest pain. The doctor continued to doubt that Hill's chest pain
13  had any cardiac etiology. He ordered a treadmill test. (A.R. 579)

14      On March 14, 2008, Richard Alley, M.D., a specialist in Family
15  Medicine and General Surgery, reviewed the record and completed a
16  Physical Residual Functional Capacity Assessment form. (A.R. 543-
17  50) He opined Hill would be able to lift up to twenty pounds
18  occasionally and ten pounds frequently; stand and/or walk, and sit,
19  for about six hours each in a normal workday, with normal breaks;
20  and push/pull without other limitations. (A.R. 544) He opined
21  Hill could kneel frequently, and perform all other postural
22  activities occasionally. (A.R. 545) He noted there was no
23  statement from a treating or examining source regarding Hill's
24  physical capacities. (A.R. 549) Dr. Alley noted Hill was able to
25  care for his own hygiene, do minimal household chores, shop, and
26  handle his own finances. Hill did not use any type of ambulatory
27  device, and reported working at appliance repair when he felt
28  physically able. At an in-person interview with a Social Security

39 - FINDINGS & RECOMMENDATION

1  representative, Hill did not appear to be in pain; he sat
2  throughout the interview; and he "would lean forward on his seat at
3  times." (A.R. 550)    Thus, Dr. Alley found Hill's allegations to be
4  only "[p]artially credible based on the objective evidence in
5  file." (*Id.*)

6      On March 19, 2008, psychologist Paul Rethinger, Ph.D. reviewed
7  the record and completed a Psychiatric Review Technique form (A.R.
8  555-67). He noted Hill does not allege any mental impairments,
9  despite taking Prozac and Cymbalta for anxiety and an adjustment
10 disorder. He found Hill's adjustment disorder and anxiety to be
11 non-severe, opining they would cause only mild limitations in
12 Hill's daily activities[9] and social functioning, and no limitations
13 in his concentration, persistence, or pace. (*Id.*)

14     On March 20, 2008, Hill underwent a standard treadmill exam.
15 The exam was basically negative, although Hill achieved less than
16 the target heart rate, limiting the reliability of the test. (A.R.
17 578)

18     On April 10, 2008, Hill saw Dr. Sweetman for followup of his
19 depression.  Hill stated he had received "an outside referral for
20 continuation of therapy," but he had received a "whole package" of
21 forms that he was unwilling to complete.  He was referred to
22 another therapist, and his Prozac and Xanax were continued without
23 change. (A.R. 575-76)

24     Hill received four weekly acupuncture treatments from April 1-
25 22, 2008, for pain in his right hip, buttock, and knee. (He

26

27     [9]Regarding Hill's daily activities, Dr. Rethinger appears to
28 have copied Dr. Alley's observations word-for-word, in most cases.
   *Compare* A.R. 550 *with* A.R. 567.

1   apparently had received one acupuncture treatment in January 2008,
2   but had "had difficulty getting a return appointment."  A.R. 577)
3   For about a week after each treatment, Hill's pain would be more
4   tolerable, and he would need less narcotics; however, his overall
5   condition did not improve greatly.  He continued to use lidocaine
6   patches and "Fentanyl lollipops."  (A.R. 573-77)

7        On April 17, 2008, Hill spoke with a counselor by phone
8   regarding his depression, panic symptoms, and anxiety.   Hill
9   indicated he previously had been overwhelmed with the "paperwork
10  requirements" associated with counseling.  He asked if he could be
11  treated solely by telephone, and was told this was not possible.
12  Notes indicate Hill had received authorization for ten counseling
13  sessions in six months.  (A.R. 574)

14       On July 12, 2008, Hill was taken to the ER by ambulance with
15  complaints of increasing pain in his lower back and legs since the
16  previous night.  He reported taking some Lyrica and ibuprofen, and
17  going to sleep, and upon awakening he felt dizzy, nauseated, and
18  lightheaded.  He also stated he "would be speaking and . . . his
19  face seemed to lock up for a second or 2 before he could keep
20  speaking and then would continue to speak normally."  (A.R. 733;
21  *see* A.R. 732-44, 770)  Hill was concerned that this was another
22  transient ischemic attack ("TIA"), which he had had in the past.
23  Objective examination failed to reveal any cause for Hill's
24  symptoms.  He was given a "GI cocktail with thoughts that [his]
25  symptoms may be related to reflux," and his symptoms improved
26  somewhat.  (A.R. 734)  He was discharged with instructions to
27  follow up with his primary care physician.  (*Id.*)

28

41 - FINDINGS & RECOMMENDATION

1    Hill was admitted to the hospital through the ER on July 29,
2  2008, for complaints of "approximately 5 hours of left-sided
3  numbness, tingling, slight weakness, and blurred vision. . . . He
4  was admitted for monitoring and neurology consultation." (A.R.
5  672; *see* A.R. 668-731)  A brain CT was negative.  Because of the
6  lack of objective evidence for a stroke or TIA, doctors raised the
7  possibility of somatization disorder.[10]    (A.R. 672)    Hill was
8  discharged on August 1, 2008, with diagnoses of "[t]ransient
9  neurological symptoms," and "Possible transient ischemic attack
10 versus somatization."  (A.R. 671)  Secondary diagnoses included
11 myofascial pain syndrome, psoriasis, adjustment disorder with
12 anxiety and depression, and ventricular bigeminy. (*Id.*)  He was
13 directed to follow up with his outpatient neurologist for further
14 testing and any treatment.  (A.R. 672)

15    On July 31, 2008, Martin B. Lahr, M.D., a specialist in
16 Pediatrics, reviewed the record in connection with Hill's request
17 for reconsideration.  He found Hill "capable of light activity with
18 postural limits."  (A.R. 602)  He reviewed Hill's history of
19 minimal findings on x-rays and MRI studies.  He noted Hill had
20 ongoing ER visits for chest pain, with negative workup.  Regarding
21 Hill's chronic back pain, he noted Hill is not a surgical candi-
22 date, and maintains baseline "with ongoing narcotic management and
23 acupuncture."  (*Id.*)

24

25    [10]"Somatization disorder is a long-term (chronic) condition in
which a person has physical symptoms that involve more than one
26 part of the body, but no physical cause can be found.  The pain and
other symptoms people with this disorder feel are real, and are not
27 created or faked on purpose (malingering)."  U.S. Library of
Medicine, National Institutes of Health, Medline Plus (10/23/12).
28 http://www.nlm.nih.gov/medlineplus/ency/article/000955.htm.

1    Hill went to the ER on August 2, 2008, with a complaint of
2  acute dizziness, and an abnormal feeling in the left side of his
3  face, and his left leg and arm.  (A.R. 645; *see* A.R. 642-62, 666-
4  67)   He was taken to the hospital by ambulance, and initially
5  presented with "left-sided numbness, tingling, slight weakness,
6  blurry vision, and difficulty with speech that was . . . completely
7  resolved [by the time he arrived at the hospital]."  (*Id.*)   Hill
8  had poor effort on finger-to-nose and rapid-alternating-movement
9  testing, and on heel-to-shin movements.   He had no obvious
10 neurological deficits in terms of leg strength.   He walked with
11 "some difficulty" using a walker.  He was evaluated by the "stroke
12 team."   An acute CT of his brain was negative.   "The stroke team
13 neurologist assessed him and did not feel he was consistent with an
14 acute stroke that needed any type of intervention."  (A.R. 646)
15 Imelda R. Dacones, M.D., a specialist in Internal Medicine, was
16 called in for consultation.   She found Hill to be "somewhat of a
17 reluctant historian," giving brief answers to her questions and
18 seeming "quite unwilling to provide more details."  (A.R. 650-51)
19 Dr. Dacones conducted an extensive neurologic evaluation of Hill
20 with no objective findings indicating any neurologic deficit.
21 Among other things, Dr. Dacones had Hill walk so she could observe
22 his gait.  She noted he initially walked "at least 8-10 steps where
23 his gait appeared normal and steady but the last 5-6 steps as he
24 left his room and further walked down the hallway he seemed to
25 develop almost a flapping motion in the left foot [as] if dragging
26 it but certainly on exam he had no weakness there and he had no
27 drop."  (A.R. 651)   She noted Hill did not "appear to have any
28 focal deficits and his gait is somewhat suspicious for

43 - FINDINGS & RECOMMENDATION

malingering." (A.R. 652)  She offered Hill a walker to use for additional safety when he walked, but Hill "was not very enthu-siastic about the use of one." (*Id.*)  Hill was discharged home, with instructions to follow up with "Dr. Freeman in Neurology." (A.R. 649)

On August 7, 2008, clinical psychologist Dorothy Anderson, Ph.D. reviewed the record regarding the "anxiety component" related to Hill's ongoing PVCs and back pain.  She noted Hill's physical symptoms were exacerbated by "somatic focus and vice versa." (A.R. 603)  She found Hill had shown "some unwillingness to pursue referrals for counsel[ing] on a consistent basis." (*Id.*)  In her opinion, most of Hill's limitations appeared to be based on his physical symptoms, rather than related to any psychological cause. (*Id.*)

Hill was seen in the ER on August 8, 2008, for complaints of "worsening dizziness, confusion, right eye blurred vision, diffi-culty getting his speech out, a cool feeling about his left ear, . . . and some numbness on the left side." (A.R. 634; *see* A.R. 632-40)  Hill was waiting to receive a walker, but indicated he was "able to ambulate around the house adequately." (*Id.*)  His neurological exam was "essentially stable" compared with his discharge from the hospital on August 1, 2008, and the doctor reassured Hill there was nothing more that could be done for him in the hospital other than "closer monitoring and nursing care." (A.R. 635)  He suggested the possibility of discontinuing Lyrica, despite Hill's persistent back pain, because of the dizziness. Hill was encouraged to follow up with Kaiser regarding getting the walker. (*Id.*)

44 - FINDINGS & RECOMMENDATION

1    On August 25, 2008, Hill was seen in the ER at the advice of
2  a nurse due to "dark tarry stools for a couple days," with no
3  abdominal pain or related symptoms.  (A.R. 622; see A.R. 619-29)
4  In addition, Hill's young son (estimated by a doctor to be eight or
5  nine years old) had "tossed a pill bottle at him and struck him in
6  the forehead." (Id.)  He had no headache or loss of consciousness,
7  and reported no unusual symptoms.  The doctor opined that being hit
8  in the head with a pill bottle would not put Hill "at risk for a
9  subdural epidural hematoma or skull fracture," and he reassured
10 Hill and sent him home.  (A.R. 623)

11    Hill was seen in the ER on August 26, 2008, for complaints of
12 thoracic and lumbar back pain following a motor vehicle accident.
13 He reported being a passenger in a vehicle that was stopped when it
14 was "rear-ended by another car going approximately 40 miles per
15 hour." (A.R. 614; see A.R. 611-16)  Notes indicate Hill had been
16 seen in the ER the previous evening "because he got hit in the head
17 with a pill bottle." (Id.)  X-rays of his back showed no fractures
18 or dislocations, and Hill was "neurologically intact on exam."
19 (A.R. 615)  He was treated with Tylenol, and reported improvement
20 in his pain.  He was directed to use Tylenol and heat, and was
21 given a prescription for Flexeril. (Id.)

22    On September 22, 2008, Hill was taken to the ER by ambulance
23 with complaints of sudden onset of dizziness and difficulty
24 speaking.  He also complained of left lower leg weakness and bloody
25 stool.  (A.R. 609-10, 861-71)  A CT scan of his head was normal.
26 After evaluation, the ER doctor opined Hill had a TIA.  Hill
27 was discharged home in good condition, with directions to return if
28 his symptoms worsened.  (A.R. 868)

45 - FINDINGS & RECOMMENDATION

1      Hill returned to the ER the next day by ambulance, again
2  complaining of an episode of dizziness and lightheadedness. (A.R.
3  847-60)  The ER doctor noted this was Hill's fourth visit in a week
4  "for different symptoms such as atypical chest pains or minor head
5  traumas." (A.R. 850)  Hill described an episode where he was lying
6  down and became sweaty and clammy.  He also had some blurred
7  vision, and "trouble getting his words out," and he was feeling
8  quite anxious. (*Id.*)  After basically a normal examination, the ER
9  doctor reassured Hill, and they discussed possible options for
10 further management of his ongoing bigeminy and other problems.  He
11 was advised to follow up with his primary doctor.  (A.R. 851)

12     From September 2008 to February 2009, there is no record of
13 Hill seeking or receiving any type of medical treatment.  The next
14 entry in the administrative record is a note from an ER visit on
15 February 18, 2009.  Hill was taken to the ER by ambulance with a
16 complaint of trembling of his head while he was driving his 13-
17 year-old son to school.  (A.R. 838-46)  Hill stated he also had
18 some blurry vision and memory impairment, stating he had called
19 "611" instead of "911" because he could not remember "911." (A.R.
20 841)  He also reported feeling some numbness in his right hand and
21 his lips, heart palpitations, and a feeling like he could not talk.
22 These symptoms lasted for an hour, and then apparently resolved
23 spontaneously.  (*Id.*)  The ER doctor did not believe Hill had
24 suffered any type of cerebrovascular incident or a TIA.  An EKG was
25 normal, and the doctor felt no additional testing was warranted.
26 Hill was discharged with instructions to follow up with his primary
27 doctor.  (A.R. 842)

28

46 - FINDINGS & RECOMMENDATION

1    On March 24, 2009, Hill was seen in the ER with a complaint of
2  worsening back pain. (A.R. 831-37) Hill stated he had been
3  released on March 23, 2009, after a two-day hospital stay (evidence
4  of which is not in the Record) in connection with complaints of
5  chest discomfort. According to Hill, he had seen his primary
6  doctor and received a shot of Demerol and a prescription for
7  Dilaudid. However, because Hill had reported an allergy to
8  Dilaudid in the past, the pharmacy refused to fill the
9  prescription. As a result, Hill went to the ER to request that the
10 prescription be filled, stating he was "quite uncomfortable."
11 (A.R. 834) After speaking with Hill's primary doctor, the pharmacy
12 filled the Dilaudid prescription. The ER doctor advised Hill to
13 take an antihistamine prior to the Dilaudid to minimize any hives
14 or other allergic reaction. (A.R. 835)

15    Hill was seen in the ER on the evening of April 2, 2009, with
16 a complaint of numbness and dropping of his left lip which had
17 started in the morning, and improved only slightly throughout the
18 day. (A.R. 819-30) He was "treated with a small amount of pain
19 medicine for his chronic back pain." (A.R. 823) He had what
20 doctors termed "a reassuring exam" in the ER, with "[n]o obvious
21 facial asymmetry and a normal neurologic exam." (*Id.*) He
22 underwent a brain MRI/MRA scan, which was unremarkable, ruling out
23 a TIA or stroke. Lab tests and an EKG also were normal. Hill was
24 discharged in stable condition. (*Id.*)

25    Hill was taken to the ER by ambulance on April 7, 2009, with
26 a complaint of substernal chest pain accompanied by nausea, and
27 slight dizziness. (A.R. 805-18) A chest x-ray and lab tests were

28

47 - FINDINGS & RECOMMENDATION

normal.  Hill was discharged with instructions to follow up with his primary doctor. (A.R. 806)

The next day, Hill again was taken to the ER by ambulance, with complaints of chest pain, depression, nausea, weakness, dizziness, and bigeminy.  (A.R. 798-800)  Only the ambulance report appears in the Record; there are no accompanying hospital treatment records.

Hill saw Geoff Gordon, M.D. at the Pain Management Clinic on April 22, 2009, "for pranic healing/energy treatment[11] for chronic back pain [and] pain [in] multiple other areas."  (A.R. 1127) After the treatment, Hill reported only mild pain relief.  He was scheduled for two more visits.  (*Id.*)

On April 28, 2009, Hill received an injection of Demerol/ Meperidine 25 mg. in the Pain Management Clinic for his complaint of severe leg pain.  (A.R. 1126)

On May 1, 2009, Hill returned to see Dr. Gordon at the Pain Management Clinic.  Dr. Gordon noted Hill was unable to tolerate, "Vicodin, tramadol, morphine, oxycodone/oxycontin, methadone, Dilaudid, Amitriptyline, nortriptyline, venlafaxine, cymbalta, citalopram, Gabapentin, diazepam, Flexeril, SOMA, [and] meloxicam." (A.R. 1124-26)  Hill had just started Fentanyl patches, and the doctor indicated he would have to wear these for nine days before they would reach maximum effect.  If the patches did not help, the

---

[11]"Pranic Healing is a . . . system of energy medicine . . . that utilizes *prana* to balance, harmonize and transform the body's energy processes.  *Prana* is a Sanskrit word that means *life-force*. . . .  Pranic Healing is a . . . system of no-touch energy healing."  http://pranichealing.com/what-pranic-healing (visited 02/01/13).

1  only two opiates Hill had not tried were "oxymorphone (Opana) and
2  levorphanol," but the latter medication's availability from the
3  manufacturer was noted to be inconsistent. (A.R. 1125)  The doctor
4  explained to Hill "that 70% of pain management is non-pharma-
5  cologic[.]"  (*Id.*)  He planned to have a pain group leader call
6  Hill to discuss self-management techniques he could try.  He also
7  referred Hill "to Karen Kurlya MD . . . who does neurostructural
8  integration technique, a type of body work that may help [Hill's]
9  pain." (*Id.*)  He also recommended Hill continue to follow up with
10 mental health services "for co-morbid anxiety and depression."
11 (*Id.*)  The doctor noted, "Very difficult pain management issue.  I
12 wish we had more to offer." (*Id.*)

13     Hill talked with Dr. Sy by phone on May 21, 2009, to discuss
14 his opiate therapy plan.  Notes indicate, "Dr. Gordon at pain
15 Clinic suggested stopping fentanyl patch for 6 days then starting
16 opana 5 mg. 1 tab every 8 hours." (A.R. 1124)  Hill had "[f]ailed
17 trazodone, nortriptyline, tramadol, and multiple opiates," and a
18 Demerol injection only helped him for a few hours.  (*Id.*)  Hill
19 wanted to know what he should do for pain until he could pick up
20 the Opana.  He was directed to take 200 mg. of ibuprofen two to
21 three times daily as needed.  He also continued to take Lyrica
22 twice daily, and use Lidoderm patches three times daily.  (*Id.*)

23     On June 30, July 7, and July 14, 2009, Hill saw therapist Sand
24 Carlyle for sessions of a Mindfulness Based Cognitive-Behavioral
25 Group for managing emotions and stress.  He was instructed in
26 meditation techniques and other coping skills.  (A.R. 1120-23)

27     On July 30, 2009, Hill was taken by ambulance to the ER for a
28 complaint of three hours of left-sided chest pain and mild nausea.

49 - FINDINGS & RECOMMENDATION

(A.R. 773-89)  Hill stated the pain started while he was walking his dog, and it improved somewhat after he rested for awhile.  Hill was treated with Fentanyl for pain and Zofran for nausea.  A chest x-ray and labs were normal, "except for a mild anemia, which is chronic."  (A.R. 777)  Hill was discharged with instructions to follow up with his primary doctor.  (A.R. 778, 780)

On August 2, 2009, Hill again was transported to the ER by ambulance, after his father was unable to awaken him.  (A.R. 772; 790-97; 959-72)  The ER doctor noted Hill initially appeared to be asleep, yet he was "clearly responsive," and later was "awake, alert, [and] answer[ed] questions appropriately."  (A.R. 793)  Hill complained of dizziness, grogginess, and light-headedness.  (*Id.*)  The doctor suggested Hill might be feigning sleep, but noted that even if he actually was asleep, it was likely that Hill's medications were causing his sleepiness.  The doctor recommended Hill not take his morning dose of clonazepam, and directed him to discuss his medication dosages with his primary physician.  (A.R. 794)

On August 6, 2009, Hill had a counseling session with therapist Laura Lee Jacobsen.  Hill expressed concerns about his own health, and also his father's medical needs.  He appeared "agitated physically," and had an "itchy rash on his face or hives."  (A.R. 1119)  Hill brought his 12-year-old son with him to the appointment, and Jacobsen noted Hill's father might be physically abusing the boy.  She also planned to "consider making a report of elder abuse" relating to treatment of Hill's father by Hill's mother and sister.  (A.R. 1119)

50 - FINDINGS & RECOMMENDATION

1    On August 11, 2009, Hill was admitted to the hospital after
2 arriving at the ER by ambulance.  He complained of severe chest
3 pain and arm pain.  (A.R. 908-58)  Hill complained that his health
4 had worsened markedly over the previous year, to the point that it
5 was "now ruining his life."  (A.R. 911)  He reportedly spent most
6 of his time in bed, hardly leaving his home, where he was living
7 with his parents and teenaged son.  He described episodes of
8 syncope, frequent PVCs, and palpitations.  A tracing in the ER
9 showed frequent PVCs with "some variability to the rhythm," which
10 led doctors to opine Hill perhaps "had a second-degree AV nodal
11 block."  (*Id.*)  Doctors discussed the possibility of a pacemaker
12 with Hill, but he "became quite alarmed at the risks," and
13 requested a referral for an outside second opinion.  Doctors noted
14 this "would require a referral from [Hill's] cardiologist," and
15 doctors "did not feel he needed an outside opinion."  (*Id.*)
16 Indeed, after further testing, doctors opined that due to Hill's
17 arrhythmias, a pacemaker could "lead to additional problems."
18 (*Id.*)

19    Hill was directed to stop taking Lisinopril, noting he was
20 "not clearly hypertensive and [was] having some lightheadedness and
21 dizziness."  (*Id.*)  He also was directed to stop taking Lipitor,
22 which doctors opined could be causing "some of his aches and
23 pains."  (A.R. 912)  He was discharged to home on August 13, 2009,
24 with discharge diagnoses of noncardiac chest pain; frequent PVCs;
25 history of major depression, recurrent; history of fibromyalgia;
26 hypercholesterolemia; chronic pain; chronic lumbar radiculopathy
27 pain; ongoing opiate therapy plan; history of panic disorder;
28 possible history of transient cerebral ischemia; probable optic

51 - FINDINGS & RECOMMENDATION

nerve injury, right eye; and sleep apnea.  (A.R. 910)  His current medications were listed as Aspirin 81 mg./day; Demerol 25 mg. every four hours as needed ("despite allergy!"); Fluoxetine 60 mg./day; Lidoderm patches as needed; Lyrica 200 mg. at bedtime; Lyrica 100 mg. three times daily; Meloxicam 15 mg. daily; Protonix 80 mg. daily; and Xanax as needed for anxiety.  (*Id.*)

The doctor who treated Hill during his hospitalization noted it was possible some of Hill's medications had contributed to his symptoms.  He then made the following observations:

> It is, however, not anticipated that [Hill] is going to feel markedly better.  He had extensive evaluations and . . . ongoing somatic symptoms without good physiologic explanation.  This is always frustrating for medical providers and patients alike.
>
> [Hill] is considering the possibility of a pacemaker. . . .  One possibility would be that a pacemaker could be placed and then [Hill] could be fairly comfortably placed on a moderate to high dose of beta-blocker.  This might succeed in suppressing his PVCs.  As with everything in [Hill's] case, great caution needs to be exercised.  He has had debilitating symptoms for many years without clear cause.  He is at great risk for unintentional iatrongenic [h]arm because of his continued return with symptoms for which we have no good treatment.

(A.R. 912[12])

On August 31, 2009, Hill talked by phone with therapist Jacobsen.  Hill stated he felt no one understood what he was going through, and he felt like he was dying.  Jacobsen asked Hill if he

---

[12]Iatrogenic harm is "induced by a physician - used chiefly of imagined ailments induced in a patient by auto suggestion based on a physician's words or actions during examination."  Webster's Third New International Dictionary 1119 (1993).

felt he needed inpatient care, and Hill stated he would think about it.  She planned to call Hill the next day to check in on him, but there is no record of that occurring. (A.R. 1118)

On September 4, 2009, Hill was admitted to the hospital after arriving at the ER by ambulance.  (A.R. 745-69; 873-907; 1074-75) He had complaints of "[s]evere substernal chest pain, [and] diaphoresis," beginning that morning and continuing throughout the day and into the evening, when his pain became more severe.  (A.R. 755)  Hill had "no evidence of acute coronary syndrome."  (A.R. 756)  He was noted to be "quite anxious," and afraid he would die if he went home, so he was admitted for observation.  He was discharged the next day with directions to follow up with his cardiologist, Dr. Fulmer, for further evaluation, and possible treatment with a pacemaker, an implantable cardiac monitor, or possible ablation of his symptomatic PVCs. (A.R. 760)

Hill was taken to the ER by ambulance on September 11, 2009, with a complaint of chest pain that had been present for one week. (A.R. 1056-73)  The pain had increased in intensity and "he could not wait anymore. . . . [H]e thought he was going to die at home, and . . . called 911."  (A.R. 1060)  Hill stated he believed the doctors were "missing his diagnosis," and they needed "to figure out what is . . . wrong with him."  (*Id.*)  Hill stated he would die if he left the hospital, so the ER doctor planned to admit him (A.R. 1060-61); however, Hill then decided to go home, indicating he would contact his primary doctor to discuss his chest pain. Hill refused to sign "an against medical advice form."  (A.R. 1059)

On September 28, 2009, Hill was taken to the ER by ambulance with a complaint of chest pain and blurred vision.  (A.R. 1039-55)

53 - FINDINGS & RECOMMENDATION

He stated the pain started "while he was in the shower with some chest pressure and shortness of breath, left arm and neck pain." (A.R. 1042)  Hill was noted to be anxious and in mild distress. (*Id.*)  A chest x-ray, EKG, and labs were normal in comparison to previous results.  Hill "declined nitroglycerin and declined any pain medicine except for Demerol." (A.R. 1043)  He was given 25 mg. of Demerol, which helped his pain somewhat.  After a second dose of Demerol, his discomfort resolved.  He was discharged with directions to follow up with his primary doctors.  (*Id.*)

On September 29, 2009, Hill saw electrophysiologist Scott Garvey, M.D. for evaluation and treatment recommendations with regard to Hill's frequent PVCs. (A.R. 1116-18)  Dr. Garvey reached the following conclusions regarding Hill's current condition:

> This is a very pleasant, unfortunate gentleman who presents with episodes of extreme fatigue and atypical chest pain and neurologic symptoms.  He has not had any clear objective findings by CT or MRI.  He has had multiple event monitors which intermittently show bigeminy.  The patient did have a recent oph-thalmologic evaluation and was felt to have had evidence of embolic event.

> I think the patient has two primary cardiac issues.  One is whether or not he needs to have his PFO treated, either mechanically or with chronic anticoagulation and the second being whether or not we should attempt to suppress his PVCs to see if he can get some symptomatic improvement from that.  I dis-cussed these issues with the patient.  If we were going to approach treating his PVCs, I would probably try and do it medically first and if that failed, we could consider ablative therapy.  This would certainly be a somewhat unusual indication for ablation but might prove to be beneficial for this patient.  I think we would need more confirmation that his symptoms are indeed related to his arrhythmia before proceeding with such an aggressive approach.

1  (A.R. 1117-18)

2      Hill saw Dr. Sy on October 14, 2009, requesting a "letter for
3  disability." (A.R. 1114-16)  The doctor reviewed Hill's history in
4  some detail in his narrative report (A.R. 1114-15), and agreed to
5  write a letter "for disability purposes stating all of his medical
6  issues." (A.R. 1116)  Hill's oxycodone dosage was increased to
7  three times daily. (*Id.*)  Dr. Sy wrote a letter dated October 16,
8  2009, regarding Hill's condition. (A.R. 974-76)  The doctor opined
9  Hill was unable to work presently, "or even in the next 1 year,"
10 due to "his ongoing active medical issues including fibromyalgia,
11 chronic pain syndrome, depression, anxiety, recurrent chest pains,
12 PVCs, recurrent dizziness, and TIA-like symptoms and the unresolved
13 issue of what to do with his possible patent foramen ovale[.]"
14 (A.R. 976)  The doctor opined Hill's "condition is permanent and
15 stationary," and he indicated his "support [for Hill's] application
16 for Social Security disability." (*Id.*)

17     Hill was taken to the ER by ambulance on October 21, 2009, for
18 a complaint of chest pain. (A.R. 1025-38)  Notes indicate this was
19 Hill's "typical chest pain that is quite severe, midsternal, makes
20 him dizzy with shortness of breath, [and] also associated with
21 ectopy [i.e., irregular heartbeat], which is well known." (A.R.
22 1028)  He was treated with Demerol and Zofran, with improvement in
23 his symptoms.  He was discharged with directions to follow up with
24 his primary doctor. (A.R. 1029)

25     On November 9, 2009, Hill was taken to the ER by ambulance for
26 a complaint of the "sudden onset of sharp left-sided chest pain
27 radiating to his arm and neck[.]" (A.R. 1011; *see* A.R. 1008-24)
28 He also had some dizziness and sweating.  An EKG, chest x-ray, and

55 - FINDINGS & RECOMMENDATION

labs were basically normal.  Hill stated Demerol was the only drug
that worked for his pain, and he was given three doses of Demerol
during his stay.  This resolved his pain, and he was discharged in
stable condition.  Hill was encouraged to consult his cardiologist
and primary physician before coming to the ER for chest pain.
(A.R. 1012)

Hill was taken to the ER by ambulance on November 16, 2009,
with complaints of left-sided chest pain, radiating into his neck
and down his arm. (A.R. 993-1007)  He also complained of "a poking
eye pain" in the morning, which had resolved by the time he arrived
at the ER.  (A.R. 996)  Notes indicate Hill had been seen eight
times since early August, with similar symptoms. Most of the time,
he was treated with Demerol for chest pain.  Hill's primary doctor,
Dr. Sy, was consulted, and expressed concern about Hill's "recent
frequent ER visits for pain-related issues[.]"  (A.R. 997)  Dr. Sy
requested that Hill "not receive Demerol in the emergency room,"
and this was conveyed to Hill by the ER doctor.  (*Id.*)  Hill was
discharged with instructions to follow up with a scheduled appoint-
ment with an eye specialist.  (*Id.*)

Hill saw Dr. Sy on November 30, 2009, for routine followup of
his ongoing problems.  (A.R. 1112-14)  Hill's lengthy "active
problem list" included the following:

> Psoriasis;  depression,  major,  recurrent;
> fibromyalgia;  hypercholesterolemia;  chest
> pain;  ventricular premature beats; strain of
> thoracic region; chronic pain; lumbar radicu-
> lopathy;  impaired  fasting  glucose;  opiate
> therapy  plan  green;  facet  syndrome;  ABNL
> finding on liver function; neuropathy; panic
> disorder; [degenerative disc disease] L5-S1;
> transient cerebral ischemia; obesity; prophy-
> lactic  vaccine  for  diphtheria,  tetanus  and
> pertussis; dizziness; prophylactic vaccine for

56 - FINDINGS & RECOMMENDATION

1
2
3
4
5

> influenza; premature beats; weakness; brady-
> cardia; MVA-traffic *invalid as #1[]; sprain
> or strain of cervical spine; sleep disorder,
> sleep apnea; [history] of stroke with [right]
> blurry vision/blindness; psychophysiologic
> disorder; benign essential [hypertension];
> prophylactic vaccination, pneumovax; blurring
> of visual image; right optic atrophy; right
> visual field defect.

6  (A.R. 1113)  Hill was scheduled to see a cardiologist to discuss

7  possible ablation and a pacemaker.  Hill stated he "does not want

8  to go to ER all the time and hopes this procedure helps."  (*Id.*)

9  At Hill's request, the doctor completed a form for Hill to request

10  an "Oregon Disability Hunting and Fishing Permit," due to his low

11  back pain.  (A.R. 1113-14)  Hill was continued on oxycodone as

12  needed for his pain.  He was encouraged to keep his scheduled

13  cardiology appointments.  (A.R. 1114)

14      Hill was taken to the ER by ambulance on December 2, 2009,

15  with a complaint of substernal chest pain with some shortness of

16  breath and nausea.  The pain was worse when he took a deep breath.

17  (A.R. 978-92)  Hill exhibited what the doctor deemed to be drug-

18  seeking behavior, indicating he could not take nitroglycerin

19  because it dropped his blood pressure, and Demerol was the only

20  thing that would relieve his pain.  The doctor noted Hill's primary

21  physician, Dr. Sy, had indicated Hill should not receive more

22  Demerol, and Hill had been informed of this, although Hill feigned

23  ignorance.  The ER doctor offered Hill Toradol and Zofran for his

24  pain and nausea.  Before Hill's workup could be completed, or the

25  doctor could even talk with him, Hill left the ER.  (A.R. 982)

26  Notes indicate Hill was scheduled for an ablation procedure on

27  December 15, 2009.  (A.R. 981)  However, later treatment records

28

57 - FINDINGS & RECOMMENDATION

1  suggest the procedure was not done at that time. (*See, e.g.*, A.R.
2  1105-06; 1111-12)

3       On December 8, 2009, Hill saw Scott Garvey, M.D. for a
4  cardiovascular condition screening, and to discuss treatment
5  options for his ongoing PVCs. (A.R. 1111-12)  Dr. Garvey noted
6  Hill had not been tried on medications to see if they would improve
7  his symptoms.  The doctor and his colleagues recommended medica-
8  tions be tried before proceeding with an ablation.  Hill was
9  started on a trial of Tikosyn. (*Id.*)

10      On December 26, 2009, Hill saw ophthalmologist Diana L.
11 Bennett, M.D. for complaints of the sudden onset of brief, sharp
12 pain and "spots" in the visual field of his right eye. (A.R. 1110)
13 Dr. Bennett noted no objective findings on exam, and indicated
14 Hill's visual field symptoms were "suggestive of transient ischemic
15 changes." (A.R. 1111)  She indicated Hill's vision is "probably
16 stable." (*Id.*)

17      Also on December 26, 2009, x-rays were taken of Hill's lumbo-
18 sacral spine in connection with his complaint of pain after a fall,
19 and a "[c]linical concern for fracture." (A.R. 1136)  No fracture
20 was seen on the x-ray, and no significant change in Hill's
21 degenerative disc disease was noted in comparison with his x-rays
22 of May 23, 2008. (*Id.*)

23      On January 15, 2010, Dr. Sy completed a "Multiple Impairment
24 Questionnaire" regarding Hill.  He listed Hill's diagnoses as
25 fibromyalgia, blurred vision, chronic back pain, dizziness,
26 atypical chest pain, and depression/anxiety. (A.R. 1077)  He
27 indicated Hill has neuropathic sharp pain daily in his back, chest,
28 and shoulder, as well as fibromyalgia pain. (A.R. 1078-79)  He

58 - FINDINGS & RECOMMENDATION

estimated Hill's pain at 7 on a 10-point scale, and indicated the pain is not controlled adequately by medication without unacceptable side effects. (A.R. 1079)  Dr. Sy estimated Hill would be able to sit for no more than two total hours, and stand/walk for no more than one total hour, in a normal workday, and he should not be required to stand/walk continuously in a work setting. (A.R. 1079-80)  He indicated Hill could lift and carry up to twenty pounds occasionally.  He opined Hill would have minimal limitation in the ability to grasp, turn, and twist objects; no limitation in the ability to use his fingers and hands for fine manipulations; and moderate limitation in using his arms for reaching. (A.R. 1080-81)  He also indicated Hill could not do pushing, pulling, kneeling, bending, or stooping on a sustained basis, and he should avoid dust and heights. (A.R. 1083)  He noted Hill had undergone physical therapy, visited a pain clinic, and consulted with cardiologists and neurologists multiple times for his conditions. (A.R. 1081)  Dr. Sy opined Hill's symptoms would increase if he were in a competitive work environment, and he would be unable to work at a full-time, competitive job. (A.R. 1081-82)

Dr. Sy further indicated the severity of Hill's symptoms and functional limitations has an emotional component, noting Hill suffers from anxiety, panic attacks, and depression. (A.R. 1082)  He opined Hill would be incapable of tolerating even a low level of stress. (*Id.*)  According to Dr. Sy, Hill would be required to take unscheduled, ten-minute rest breaks every one to two hours.  He estimated Hill likely would be absent from work more than three times per month. (A.R. 1083)

59 - FINDINGS & RECOMMENDATION

1    On January 21, 2010, Hill saw Dr. Sy to request referral to
2  "OSHU cardiologist Dr. Waquin for ablation." (A.R. 1106)  Hill was
3  frustrated, and felt he was not getting proper treatment.
4  Dr. Garvey apparently had indicated in his treatment notes that
5  Hill "could request another electrophysiologist if he desires."
6  (*Id.*)  Hill also was angry that he had received a letter regarding
7  his multiple ER visits for chest pain.  Hill "was upset that he is
8  being branded as a drug seeker," and wanted his records changed.
9  (*Id.*)  Dr. Sy put in a request for the referral to OSHU, but
10 apparently, the request was denied. (*Id.*)  Dr. Sy discussed Hill's
11 concerns with him, and directed him to return to the clinic as
12 needed.  (A.R. 1108)

13    On February 8, 2010, Hill spoke with Dr. Sy by phone.  Hill
14 had done a trial of Tikosyn, a drug used to treat irregular
15 heartbeats, but it had failed to resolve his symptoms.  Hill
16 expressed a lack of confidence in Dr. Garvey, because Hill "got the
17 impression that Dr. Garvey does not often do the ablation procedure
18 [Hill] needed." (A.R. 1105-6)  Hill was advised to call his
19 cardiologist, Dr. Fulmer, to discuss treatment options.  (A.R.
20 1106)  Hill talked with Dr. Fulmer the same day, and she planned to
21 refer Hill to an educational program.  (A.R. 1105)

22    On April 14, 2010, Hill underwent a psychodiagnostic evalua-
23 tion by clinical psychologist Patrick Ethel-King, Ph.D., at the
24 request of the State agency.  (A.R. 1085-97)  The doctor reviewed
25 Hill's medical history and treatment notes, and conducted an
26 interview of Hill.  Hill stated his primary mental health complaint
27 is depression.  His symptoms include sleep disturbance, low mood,
28 problems concentrating, anxiety, appetite variations, panic

attacks, dizziness, crying spells, and "feeling overwhelmed." (A.R. 1086) Hill drove himself to the evaluation. He was noted to be cooperative, able to express himself clearly, and able to understand questions and respond appropriately. His affect was noted to be "flat." (A.R. 1088) Other than asking to stand during part of the interview, Hill exhibited no other pain behaviors. The doctor noted Hill graduated from high school successfully, and completed five months of "vocational training in the area of HVAC and appliance repair." (A.R. 1089) Although the doctor did not conduct any intelligence tests, from Hill's mental status exam, the doctor opined Hill's "intellectual ability is in the low-average classification range." (A.R. 1088)

Hill completed the MMPI-2 test "within a longer than average amount of time." (Id.) His scoring on the validity scale suggested "significant symptom exaggeration." (A.R. 1089) Hill's clinical profile suggests he may be overly-concerned about his health and bodily functions, and may over-react to minor physical dysfunction. The doctor noted individuals with similar clinical profiles often report "feeling weakness, fatigue, and dizzy"; "appear anxious, tense, nervous, restless, irritable, dysphoric, brooding, and unhappy"; and "often report depressed mood, withdrawal, and show a lack of initiative." (Id.) The doctor indicated these individuals generally "have a poor prognosis for traditional psychotherapy," and they "tend to be passive-dependent and harbor hostility toward those who are perceived as not offering enough attention and emotional support." (Id.)

Dr. Ethel-King indicated that because of the inconsistency between Hill's "self-report, clinical presentation and the

61 - FINDINGS & RECOMMENDATION

object[ive] testing it is difficult to determine the degree and validity of [Hill's] reported emotional distress.  As a result, an anxiety and depressive disorder should be ruled out."  (A.R. 1090) Hill stated he could no longer maintain his appliance repair business due to his chest pain, chronic pain, fibromyalgia, and high blood pressure.  However, the evaluator noted:

> Mr. Hill's psychological testing suggests that although he may be experiencing health related difficulties, there is a significant likeli-hood that he is exaggerating his health related difficulties.  In addition, as noted earlier, [Hill's] clinical presentation was not consistent with excessive chronic pain.

(*Id.*)  On a "Medical Source Statement of Ability to do Work-Related Activities (Mental)," Dr. Ethel-King indicated Hill's ability to understand, remember, and carry out instructions would not be affected by his impairment, nor would his mental problems affect his ability to interact appropriately with supervisors, coworkers, and the public, or to respond appropriately to changes in the routine work setting.  (A.R. 1095-96)  He opined Hill would be able to manage benefits, should they be awarded.  (A.R. 1097)

Hill was admitted to the hospital on April 21, 2010, to start him on Sotalol to treat his symptomatic PVCs.  (A.R. 1134-35)  He also "had a transcranial Doppler bubble study[13], which demonstrated

---

[13]A transcranial Doppler bubble study is a test to evaluate the blood flow to and in the brain.  Tiny bubbles are injected into a blood vessel, and sound waves show whether the bubbles reach the brain.  The test is used to diagnose an abnormal opening between the chambers of the heart, which can cause blood to be pumped into the body without first being oxygenated adequately by the lungs. The test also can identify whether blood flow to the brain is blocked by spasms, clots, or plaque.  *See* "Fact Sheet for Patients and Families: Transcranial Doppler (TCD) and Bubble Studies," http://intermountainhealthcare.org/ext/Dcmnt?ncid=520842925
(continued...)

increased rate of bubbles and right to left shunt with Valsalva maneuver[.]" (A.R. 1134) He was discharged, with followup to be conducted on an outpatient basis by cardiologist Todd Caulfield, M.D. Discharge recommendations included a "transesophageal echo-cardiogram and subsequent PFO[14] closure." (A.R. 1135)

On February 2, 2011, Juliann Haislip, Psy.D. of Western Psychological & Counseling Services, P.C. ("Western") completed a Psychiatric/ Psychological Impairment Questionnaire (A.R. 1139-46), and a Diagnostic Summary (A.R. 1147-49) regarding Hill. She indicated Hill began treatment at Western on October 14, 2010, and he was being treated once per week for "Major Depressive Disorder, Recurrent, Moderate; Post Traumatic Stress Disorder By History; [and] Attention Deficit Hyperactivity Disorder, By History." (A.R. 1139 [15]) She listed Hill's prognosis as "Fair." (*Id.*) Dr. Haislip indicated the following clinical findings (by selecting from a checklist) in support of her diagnosis: poor memory; appetite disturbance with weight change; sleep disturbance; mood distur-bance; emotional lability; anhedonia or pervasive loss of interests; psychomotor agitation; feelings of guilt/worthlessness; difficulty thinking or concentrating; social withdrawal or isola-

---

[13](...continued)
(Intermountain Healthcare 2010) (visited 11/14/2012).

[14]A PFO, or "patent foramen ovale . . . is a hole in the heart that didn't close the way it should after birth." Most people with a PFO never know they have the condition, because it seldom creates signs or symptoms. Thus, most people never need treatment for the disorder. www.mayoclinic.com/health/patent-foramen-ovale/DS00728 (visited 11/07/12).

[15]Although Dr. Haislip indicated Hill was being treated once per week, no treatment notes from this doctor or facility appear in the administrative record.

63 - FINDINGS & RECOMMENDATION

tion; illogical thinking or loosening of associations; decreased energy; intrusive recollections of a traumatic experience; persistent irrational fears; generalized persistent anxiety; and hostility and irritability. (A.R. 1140) She noted Hill's score on the Beck Depression Inventory indicated a "severe level of depression." (*Id.*) She indicated Hill "has panic attacks approximately 4-7 x/mo. However, it is unclear to what extent these are due to heart problems." (A.R. 1141) Dr. Haislip indicated Hill's symptoms and functional limitations are consistent with his mental impairments. (*Id.*)

Regarding Hill's mental functional capacity, Dr. Haislip opined Hill is mildly limited in his ability to interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, and be aware of normal hazards and take appropriate precautions; moderately limited in his ability to carry out both simple and detailed instructions, work in coordination with or proximity to others without being distracted by them, complete a normal workweek without interruptions from psychologically-based symptoms, perform at a consistent pace without an unreasonable number and length of rest period, travel to unfamiliar places or use public transportation, and set realistic goals or make plans independently; and markedly limited in his ability to remember locations and work-like procedures, understand and remember both simple and detailed instructions, and maintain attention and concentration for extended periods. (A.R. 1142-44) Based on the available evidence, the doctor was unable to rate Hill's functional ability to sustain an ordinary routine without

64 - FINDINGS & RECOMMENDATION

supervision, perform activities within a schedule, maintain regular attendance and be punctual, make simple work-related decisions, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, or respond appropriately to changes in the work setting. (*Id.*)  She indicated Hill has no limitation in his ability to maintain socially appropriate behavior, and to adhere to basic standards of neatness and cleanliness. (A.R. 1143)

Dr. Haislip noted Hill's depression and response to stress exacerbate his pain, and interfere with his sleep.  She further noted, "[Hill] also reports that when experiencing panic attacks, his heart problems appear to worsen." (A.R. 1145)  The doctor indicated Hill "meets criteria for Major Depressive Disorder, Recurrent, Moderate due to [symptoms] including sadness, pessimism, guilt/shame, loss of pleasure/interest, low self esteem, crying, agitation, indicisiveness [sic], worthlessness, loss of energy, poor sleep, change in appetite, irritibality [sic], poor concentration, fatigue, and loss of interest in sex." (A.R. 1149) Hill's treatment goals included decreasing his symptoms of depression and PTSD, and learning to cope with chronic pain. (*Id.*)

### B.  Hill's Testimony

#### 1.  Hill's hearing testimony

At the time of the ALJ hearing, Hill was 48 years old.  He has two children, ages thirteen and eighteen at that time, and his youngest child lives with him. (A.R. 41)

After graduating from high school in 1979, Hill took some vo-tech courses, earning certification in HVAC in 1983. (A.R. 37)  He started his own appliance repair business, Ace Appliance, around

65 - FINDINGS & RECOMMENDATION

1997, and in 2000, he bought another business and added it to his
existing business. (A.R. 41-42) He repaired "[a]ll types of
heating, air conditioning units, central air, washers, dryers,
refrigerators, all appliances[.]" (A.R. 43) In order to perform
the repairs, he would have to move the appliances around, and their
weight varied from around 50 pounds to as much as 150 pounds.
(A.R. 43-44) He estimated that he averaged carrying 50 pounds
every day. The job required him to sit for about two hours during
an eight-hour day, and stand/walk for about three hours during the
day. He also was required to bend, crawl, climb, and balance as
part of the job. (A.R. 44-45)

Hill stopped working due to pain. He had reached the point
where he had to hire someone to help him with lifting, and he was
unable to meet customers' expectations regarding the timeliness of
repairs. (A.R. 42) Hill stated he currently was being treated for
heart problems, depression, fibromyalgia, chronic pain, and "a lot
of different issues." (A.R. 46) He has multiple medication
allergies, which limits what he can take for pain. At the time of
the hearing, he was taking Lyrica for pain, Protonix for acid
reflux, Xanax for anxiety, Oxycodone for pain, and aspirin "for
blood thinner." (A.R. 47-48) He stated he has an allergic reac-
tion when he takes Demerol orally, but no reaction if he receives
an injection, so when he goes to the ER for pain, he always asks
for Demerol, which he stated is "the only one I can take for pain."
(A.R. 48)

Hill stated he experiences pain every day. He has had leg
pain ever since a 2005 car accident. If the pain is severe, he has
to lie down and use ice until it stops. He also has "burning pain

66 - FINDINGS & RECOMMENDATION

all the time" from fibromyalgia, for which he takes Lyrica.  (A.R. 49)  He tries to get good sleep at night, but it is hard to do because of his "bad leg."  (*Id.*)

Hill estimated he could lift/carry twenty pounds.  The heaviest thing he lifts at home weighs perhaps ten to fifteen pounds.  He can hold his head in one position for half an hour to an hour.  If he lifts or carries too much weight, he will strain something, and then be down and unable to do anything for a long time.  His ability to sit varies from day to day, but on average, he estimated he can only sit for twenty-five to thirty minutes at a time before he has to stand up.  If he sits for too long, his leg, and sometimes even his crotch, will go numb. He can stand for twenty to sixty minutes at a time, depending on the day, before he has to sit down and rest.  If he cannot stand long enough to finish a task, such as doing the dishes, he does what he can and then returns to the task later.  Similarly, he staggers his household chores.  He estimated he can walk for twenty to thirty minutes at a time, but if he walks too much, he will experience a lot of pain afterwards.  (A.R. 50-51)

On a typical day, Hill's "built in pain clock" will wake him at 4:00 a.m. to take his Lyrica.  He sometimes also takes an Oxycodone at that time, depending on his pain level.  Later in the morning, he gets his son off to school, does some dishes and moves around as much as he is able, and then spends most of his time lying on the couch "because of the pain."  (A.R. 51-52)  He cooks occasionally, but "mostly it's just pre-prepped stuff."  (A.R. 52) On a bad day, he spends all day on the couch, "not moving at all, in agony, total agony and basically can't get comfortable at all."

(*Id.*)  He sometimes visits friends on the weekend, but his energy level is "disappointingly low," even when he takes vitamins.  (*Id.*) Stress and trying to do things make his fatigue worse. (A.R. 53) He does not sleep well, waking up several times a night on most nights.  His memory is "not as good as it used to be." (*Id.*)

Hill takes Prozac for depression, but at the time of the hearing, he had not seen a counselor in over a year due to a change in insurance and doctors.  (A.R. 53-54)  His depression leaves him with low energy, and feeling "just gloomy."  (A.R. 55)  It depresses him that at his age, he is unable to do anything and his body has "let [him] down that much."  (*Id.*)  He has frequent panic attacks that last five to ten minutes each.  During an attack, he feels like he is going to die, he shakes, "everything's spinning around," and he has trouble breathing.  (*Id.*)  Hill said his doctor described his panic attacks using a ladder analogy.  Considering a ladder with ten rungs, most people ordinarily are on the lowest rungs, and it takes a lot of stress for them to reach the top. Hill is "hanging right there on the nine and the ten all the time, so when something hits, boom, [he goes] right into the panic." (A.R. 55-56)  He takes Xanax for the panic attacks.  He stated his medications make him "real drowsy and some of them make [him] dizzy."  (A.R. 56)

Hill stated he is unable to return to running his appliance repair business.  (*Id.*)

The ALJ noted that ER physicians had opined Hill was exhibiting drug-seeking behavior.  He questioned why Hill continued to request Demerol despite the fact that "the vast majority of all findings are normal."  (A.R. 57-58)  Hill stated the drug-seeking

68 - FINDINGS & RECOMMENDATION

notations were upsetting to him because when he goes to the ER, he is in pain.  He stated he lost fifty percent of his right eye from a blood clot; he has a hole in his heart; and when he goes to the ER, his chest will hurt from his neck down his arm, and he sometimes has a very low pulse, all of which causes him pain.  He stated he no longer receives narcotics in the ER because he has his own pain medications, but they give him anti-nausea drugs.  (A.R. 58-59)

The ALJ decided to order a psychological evaluation, and held the record open pending receipt of that report.  He noted that if vocational testimony was indicated, it would be obtained after the evaluation.  (A.R. 5961)

### 2.  *Hill's written testimony*

At or around the time of his application for benefits in 2007, Hill completed a Function Report – Adult.  (A.R. 156-63)  He stated when he gets up in the morning, he tries to work if he feels up to it, but he spends most of his time in bed.  (A.R. 156)  He tries to help his son as much as he can, but his son ends up helping Hill more often. (A.R. 157)  Hill feeds and waters his "very small dogs," and puts them in the dog run.  His son walks the dogs. (*Id.*)  Hill indicated that before his illness, he enjoyed fishing, hiking, camping, working out, and "all kinds of things" that he cannot do any longer.  (*Id.*; A.R. 160)  He is able to shower, shave, and use the toilet without assistance, but due to pain, he does very little in the way of household tasks, and he cannot cook, clean, or do his own laundry. (A.R. 157-58)  He stated, "Pain controls me."  (A.R. 158)

69 - FINDINGS & RECOMMENDATION

When Hill's pain level is not at its highest, and his leg does not feel weak, he is able to drive a car for short periods of time. (A.R. 159)  He only shops "when absolutely necessary," and only for a very brief period of time.  (*Id.*)  He is able to handle his own money, and pay his bills, although writing checks is painful for him.  (A.R. 159-60)

Hill was attempting to work part-time, but he had to have someone accompany him "to carry stuff."  (A.R. 160)  His overall activity level has decreased dramatically due to pain, and he does not even want to try to do things because of pain.  (*Id.*)  He stated he is no longer interested in social activities because of pain, and it is "hard to have fun."  (A.R. 161)  He finds it hard to concentrate and complete tasks.  He has problems with all types of postural activities.  (*Id.*)  When his leg pain is severe, he uses a cane when walking.  He indicated the cane was prescribed during one of his hospital visits eight months prior to the ALJ hearing.  (A.R. 162)  Hill's ability to follow spoken instructions is affected by how he is feeling at the time.  (A.R. 159)  He gets along well with authority figures, and handles stress and changes in routine "OK."  (A.R. 162)

Hill also completed a Claimant Pain Questionnaire (A.R. 164-66), and a Claimant Fatigue Questionnaire (A.R. 167-70).  He stated he has aching, weakness, and numbness in his right leg and lower back.  He has pain constantly, but it worsens with activity, and varies from 7 to 10 on a 10-point scale.  Pain medications (oral and patches), and ice packs, make the pain better.  (A.R. 164)  Besides medication, Hill has also tried massage and acupuncture. (A.R. 165)  He estimated he can be up and active for three to four

hours before he has to rest.  He is unable to finish most household tasks all at one time, and he requires assistance with his household chores.  He used to enjoy hiking, fishing, camping, and other activities that he cannot do any longer.  He takes occasional walks, but can only walk about a quarter of a mile without resting.  When he goes out, someone drives him.  He visits friends or relatives only occasionally.  (A.R. 165-66)

Hill first began feeling fatigued a short time after his first car accident.  He takes two or three naps a day.  He usually does not even attempt activities because of pain and fatigue, but if he does, he must rest frequently.  (A.R. 167)  He indicated he never cooks, and friends cook for him.  (A.R. 168)  He feels sad from his pain, and nervous about having enough money to pay his bills.  He estimated he can walk for about thirty minutes, and stand or sit for about an hour before having to change positions and rest.  He can bend occasionally, depending on his pain level.  He can lift up to ten pounds frequently.  He can reach forward or up frequently, but this also depends on his pain level.  (A.R. 169)

### III.   DISABILITY DETERMINATION AND THE BURDEN OF PROOF

#### A.   Legal Standards

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

"Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the

1  meaning of the Social Security Act." *Keyser v. Commissioner*, 648
2  F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520).  The
3  Keyser court described the five steps in the process as follows:

> (1) Is the claimant presently working in a
> substantially gainful activity?  (2) Is the
> claimant's impairment severe?  (3) Does the
> impairment meet or equal one of a list of
> specific impairments described in the regula-
> tions?  (4) Is the claimant able to perform
> any work that he or she has done in the past?
> and (5) Are there significant numbers of jobs
> in the national economy that the claimant can
> perform?

10  *Keyser*, 648 F.3d at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094,
11  1098-99 (9th Cir. 1999)); *see Bustamante v. Massanari*, 262 F.3d
12  949, 953-54 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520 (b)-(f)
13  and 416.920 (b)-(f)).  The claimant bears the burden of proof for
14  the first four steps in the process.  If the claimant fails to meet
15  the burden at any of those four steps, then the claimant is not
16  disabled.  *Bustamante*, 262 F.3d at 953-54; *see Bowen v. Yuckert*,
17  482 U.S. 137, 140-41, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119
18  (1987); 20 C.F.R. §§ 404.1520(g) and 416.920(g) (setting forth
19  general standards for evaluating disability), 404.1566 and 416.966
20  (describing "work which exists in the national economy"), and
21  416.960(c) (discussing how a claimant's vocational background
22  figures into the disability determination).

23      The Commissioner bears the burden of proof at step five of the
24  process, where the Commissioner must show the claimant can perform
25  other work that exists in significant numbers in the national
26  economy, "taking into consideration the claimant's residual
27  functional capacity, age, education, and work experience." *Tackett*
28  *v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).  If the Commissioner

72 - FINDINGS & RECOMMENDATION

1  fails meet this burden, then the claimant is disabled, but if the
2  Commissioner proves the claimant is able to perform other work
3  which exists in the national economy, then the claimant is not
4  disabled. *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R.
5  §§ 404.1520(f), 416.920(f); *Tackett*, 180 F.3d at 1098-99).

6      The ALJ determines the credibility of the medical testimony
7  and also resolves any conflicts in the evidence. *Batson v. Comm'r*
8  *of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) (citing
9  *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)).
10 Ordinarily, the ALJ must give greater weight to the opinions of
11 treating physicians, but the ALJ may disregard treating physicians'
12 opinions where they are "conclusory, brief, and unsupported by the
13 record as a whole, . . . or by objective medical findings." *Id.*
14 (citing *Matney, supra*; *Tonapetyan v. Halter*, 242 F.3d 1144, 1149
15 (9th Cir. 2001)).  If the ALJ disregards a treating physician's
16 opinions, "'the ALJ must give specific, legitimate reasons'" for
17 doing so. *Id.* (quoting *Matney*).

18     The law regarding the weight to be given to the opinions of
19 treating physicians is well established.  "The opinions of treating
20 physicians are given greater weight than those of examining but
21 non-treating physicians or physicians who only review the record."
22 *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1036 (9th Cir.
23 2003).  The *Benton* court quoted with approval from *Lester v.*
24 *Chater*, 81 F.3d 821, 830 (9th Cir. 1995), where the court held as
25 follows:

26          As a general rule, more weight should be given
            to the opinion of a treating source than to
27          the opinion of doctors who do not treat the
            claimant.   At  least  where  the  treating
28          doctor's  opinion  is  not  contradicted  by

> another doctor, it may be rejected only for
> "clear and convincing" reasons.  We have also
> held that "clear and convincing" reasons are
> required to reject the treating doctor's
> ultimate conclusions.  Even if the treating
> doctor's opinion is contradicted by another
> doctor, the Commissioner may not reject this
> opinion without providing "specific and
> legitimate reasons" supported by substantial
> evidence in the record for so doing.

*Id.* (quoting *Lester, supra*).

The ALJ also determines the credibility of the claimant's testimony regarding his or her symptoms:

> In deciding whether to admit a claimant's
> subjective symptom testimony, the ALJ must
> engage in a two-step analysis.  *Smolen v.
> Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).
> Under the first step prescribed by *Smolen*,
> . . . the claimant must produce objective
> medical evidence of underlying "impairment,"
> and must show that the impairment, or a combi-
> nation of impairments, "could reasonably be
> expected to produce pain or other symptoms."
> *Id.* at 1281-82.  If this . . . test is satis-
> fied, and if the ALJ's credibility analysis of
> the claimant's testimony shows no malingering,
> then the ALJ may reject the claimant's testi-
> mony about severity of symptoms [only] with
> "specific findings stating clear and con-
> vincing reasons for doing so."  *Id.* at 1284.

*Batson*, 359 F.3d at 1196.

### B.   The ALJ's Decision

The ALJ found Hill has not engaged in substantial gainful activity since his amended alleged onset date of January 1, 2008. (A.R. 17)  He found Hill has severe impairments consisting of "obesity, mild degenerative disc disease of the spine, fibro-myalgia, and anxiety."  (*Id.*)  He acknowledged that Hill alleges additional conditions including strokes, gastroesophageal reflux disease, psoriasis, optic neuropathy/embolic event, chronic

74 - FINDINGS & RECOMMENDATION

bigeminy and trigeminy with occasional secondary heart block with bradycardia, chronic pain, history of transient ischemic attack, history of small patent foramen ovale, hypercholesterolemia, sleep apnea, premature ventricular contractions (PVCs), and chronic fatigue.  However, the ALJ found these additional conditions "have caused only transient and mild symptoms and limitations, are well controlled with treatment or are otherwise not adequately supported by the medical evidence in the record." (A.R. 17-18)  Accordingly, he found these additional alleged impairment not to be severe. (A.R. 18)

The ALJ found that none of Hill's impairments, singly or in combination, meet the Listing level of severity. (*Id.*)  He specifically found Hill's "mild degenerative disc disease does not meet or equal the Listing found at 1.04, *disorders of the spine*, as there is no evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication." (*Id.*)  He found Hill's fibromyalgia does not equal the criteria of any musculoskeletal impairment in the Listings. (*Id.*)  He found Hill's anxiety does not meet or equal Listing 12.06, because the impairment has not caused at least two "marked" limitations, or one "marked" limitation and repeated episodes of decompensation of extended duration.  (*Id.*)

With regard to Hill's daily activities, the ALJ found Hill to be only mildly restricted.  He noted Hill does "household chores such as doing the dishes and cooking meals such as stir-fry"; he gets up in the morning and gets his son ready for school; he has a driver's license, drives, and occasionally shops for groceries; he reads books and does crossword puzzles; and he "occasionally takes

75 - FINDINGS & RECOMMENDATION

short walks with his son." (*Id.*)  The ALJ further noted that in November 2009, Hill asked his doctor to "fill out an Oregon Disability Hunting and Fishing Permit." (A.R. 18-19)  The ALJ further found Hill has mild difficulties in social functioning, and moderate difficulty with memory and concentration. (A.R. 19)  He found Hill has had no repeated episodes of decompensation. (*Id.*)

The ALJ found Hill "has the residual functional capacity to perform unskilled, light work[.]" (*Id.*)  He found the objective evidence of record does not show that Hill's severe impairments would preclude him from engaging in all basic work activity. (A.R. 20)  The ALJ also found Hill "is only partially credible as psychological testing shows evidence of exaggeration of symptoms and the record shows a pattern of drug seeking behavior." (*Id.*)  He found the record evidence indicates Hill's "symptoms are disproportionate to the objective and clinical findings." (*Id.*)  The ALJ noted that although Hill has sought frequent emergency treatment "for complaints of an irregular heartbeat, shortness of breath, chest pain, blurry vision, and dizziness," extensive diagnostic testing has identified "no ischemic, cardiopulmonary or neurologic process as the source of his chest pain," and "[p]roviders have frequently assessed his dizziness, chest pain and palpations [sic] as secondary to anxiety." (A.R. 21)

The ALJ noted Hill's treadmill test in March 2008 was "normal for a man of [his] age." (A.R. 22)  When Hill went to the ER in August 2008, he was evaluated thoroughly by "the stroke team," but "he was discharged with the diagnosis of episodes of transient left-sided numbness, weakness, blurred vision, dizziness and lightheadedness. . . ." (*Id.*)  Dr. Dacones opined Hill's symptoms

76 - FINDINGS & RECOMMENDATION

could be caused by his Lyrica, but Hill was not interested in reducing his dosage.  Further, Dr. Dacones noted Hill's "gait was somewhat suspicious for malingering."  (*Id.*)   The ALJ noted numerous other clinical evaluations and testing that resulted in no objective findings to explain his ongoing symptoms.  (A.R. 22-23) He further noted Hill's MMPI-2 validity scales indicated that although the profile was valid, his score "suggested significant symptom exaggeration."  (A.R. 23)   The ALJ found Hill's medical records "support a conclusion that [he] has some exertional and nonexertional limitations, but no limitations that can preclude all work whatsoever."  (*Id.*)

The ALJ gave "great weight" to the opinions of the two state-agency consultants who performed a paper review of Hill's records - Dr. Alley, who reviewed the record in March 2008, and Dr. Lahr, who reviewed the record in July 2008.  Dr. Alley opined Hill had the physical residual functional capacity ("RFC") "for light exertion activity with some postural limitations."  (*Id.*)   Dr. Lahr con-curred in Dr. Alley's opinion. (*Id.*)  However, the ALJ found "the record as a whole does not support a finding [that Hill] has any postural limitations."  (*Id.*)   He gave "some weight" to the opinions of the two psychologist consultants, Dr. Rethinger and Dr. Anderson, both of whom concluded Hill's adjustment disorder and anxiety caused only mild limitations in his activities of daily living and social functioning, and no difficulties in concentra-tion, persistence, or pace.  Giving Hill "the full benefit of the doubt," the ALJ found Hill "has a severe anxiety disorder which results in moderate limitation of [his] concentration[,] persistence and pace."  (A.R. 24)

1       The ALJ accorded "significant weight" to the opinions formed
2    by Dr. Ethel-King based on his evaluation of Hill.   The doctor
3    found Hill's clinical presentation and reported activities of daily
4    living were not congruent with his reported symptoms or the results
5    of objective testing.   This doctor found Hill has "no mental
6    impairments that affected his ability to understand, remember, and
7    carry out instructions, . . . [or] his ability to interact
8    appropriately with supervision, coworkers or the public, as well as
9    respond to changes in the routine work setting." (*Id.*)   Again,
10   however, according Hill "the full benefit of the doubt," the ALJ
11   found that Hill's "anxiety disorder results in mild limitations in
12   social functioning and moderate limitations in concentration[,]
13   persistence and pace." (*Id.*)

14       The ALJ gave "little weight" to the October 2009 opinion of
15   Hill's treating physician Dr. Sy.   He found the doctor's opinion to
16   be "extremely unpersuasive," noting the doctor, himself, indicated
17   "his opinion relies on [Hill's] self-report that he has been unable
18   to work for the past five years because of multiple medical
19   issues." (*Id.*)   In addition, the ALJ noted Dr. Sy simply listed
20   Hill's symptoms, and then noted that the majority of Hill's
21   "extensive test results have been normal." (A.R. 24-25)   Further,
22   the ALJ noted Dr. Sy's opinion letter was written a month before
23   the doctor was contacted by ER doctors regarding Hill's "drug
24   seeking behavior when Dr. Sy reportedly requested that the
25   emergency department doctors cease giving [Hill] Demerol injections
26   for his alleged chest pain." (A.R. 25)   The ALJ also gave little
27   weight to Dr. Sy's January 2010 opinion regarding Hill's functional
28   abilities.   The ALJ noted Dr. Sy's responses on the form provided

1  by Hill's attorney "provided very little analysis or citation to
2  medical evidence to explain its conclusions," and the doctor's
3  opinion "is not supported by the clinical findings or the record as
4  a whole." (*Id.*)   The ALJ also noted Dr. Sy failed to mention
5  anything about Hill's "drug seeking behavior," and the doctor's
6  instructions to the ER department not to give Hill any more Demerol
7  for his atypical chest pain. (*Id.*)

8       In addition to finding that Hill's "functional limitations are
9  not as significant and limiting as have been alleged," the ALJ also
10  found Hill had not been fully compliant with his providers'
11  recommendations.   The ALJ gave only one example of this, noting
12  that in April 2008, Hill admitted to his doctor that he had failed
13  to follow through with counseling because he had failed to connect
14  with the therapist and was "unwilling to fill out a 'whole package'
15  of paperwork." (*Id.*)

16      The ALJ also found, "The record contains numerous inconsistent
17  statements made by [Hill] which further undermines his credi-
18  bility." (*Id.*)   He noted that on Hill's application, he reported
19  that he did no household chores or cooking, but at the hearing, "he
20  testified that he cooks prepared foods and stir-fry, and he does
21  household chores including washing the dishes." (*Id.*) In May 2009,
22  he told Dr. Gordon that acupuncture had not helped his pain in the
23  past, but "the record shows [he] repeatedly reported acupuncture
24  was helpful." (*Id.*)

25      The ALJ further found that Hill's "work history undermines his
26  credibility." (A.R. 26)   He noted Hill initially claimed he became
27  disabled and unable to work in May 2005, yet he continued to
28  operate his appliance repair business until sometime in 2008.

79 - FINDINGS & RECOMMENDATION

1  (*Id.*)    The ALJ also found "very strong evidence of drug seeking
2  behavior" in the record, "reflect[ing] poorly on [Hill's] credi-
3  bility." (*Id.*)    For all these reasons, the ALJ concluded Hill's
4  allegations are not entirely credible, and his condition does not
5  warrant any further limitations than those set forth in the ALJ's
6  RFC determination.  (*Id.*)

7      The ALJ found Hill is unable to perform any of his past
8  relevant work.  However, he found Hill is able to perform other
9  jobs that exist in significant numbers in the national economy.
10  (A.R. 26-27)  He found that although Hill cannot perform the full
11  range of light work, the additional limitations included in his RFC
12  assessment "have little or no effect on the occupational base of
13  unskilled light work." (A.R. 27)  The ALJ therefore concluded that
14  Hill was not disabled at any time from January 1 2008, through
15  July 15, 2010, the date of the ALJ's decision.  (*Id.*)

### IV.  STANDARD OF REVIEW

18      The court may set aside a denial of benefits only if the
19  Commissioner's findings are "'not supported by substantial evidence
20  or [are] based on legal error.'"  *Bray v. Comm'r of Soc. Sec.*
21  *Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v.*
22  *Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *accord Black*
23  *v. Comm'r of Soc. Sec. Admin.*, slip op., 2011 WL 1930418, at *1
24  (9th Cir. May 20, 2011).  Substantial evidence is '"more than a
25  mere scintilla but less than a preponderance; it is such relevant
26  evidence as a reasonable mind might accept as adequate to support
27  a conclusion.'"  *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035,
28  1039 (9th Cir. 1995)).

80 - FINDINGS & RECOMMENDATION

1    The court "cannot affirm the Commissioner's decision 'simply
2  by isolating a specific quantum of supporting evidence.'" *Holohan
3  v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett
4  v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)).  Instead, the court
5  must consider the entire record, weighing both the evidence that
6  supports the Commissioner's conclusions, and the evidence that
7  detracts from those conclusions.  *Id.*  However, if the evidence as
8  a whole can support more than one rational interpretation, the
9  ALJ's decision must be upheld; the court may not substitute its
10 judgment for the ALJ's.  *Bray*, 554 F.3d at 1222 (citing *Massachi v.
11 Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

12

13                      *V.   DISCUSSION*

14     Hill argues the ALJ erred in numerous respects, each of which
15 is discussed below.

16

17          *A.   Hill's Credibility, and Weight of Evidence*

18     Hill argues the ALJ erred in finding his complaints to be less
19 than credible, and in failing to give great weight to the opinions
20 of his treating physician, Dr. Sy.  Dkt. #17, pp. 23-29.

21

22 *1.   Credibility assessment*

23      *a.   Objective medical evidence*

24     Hill argues the ALJ erred in finding his "medical impairments
25 of chronic bigeminy/trigeminy with bradycardia, chronic pain,
26 premature ventricular contractions, optic neuropathy from embolic
27 event, and subsequent chronic fatigue; as well as depression, are
28 'transient', are mild symptoms or limitations, are well-controlled

81 - FINDINGS & RECOMMENDATION

1 with treatment or not supported by the medical evidence." *Id.*,

2 p. 25 (citing A.R. 17).  Hill appears to argue the ALJ based his

3 credibility assessment on one instance, in October 2009, when an ER

4 doctor reviewed diagnostic studies conducted by Hill's cardiologist

5 that indicated Hill does not have "an active ischemic, cardiopul-

6 monary or neurologic process as the source of his chest pain."

7 (A.R. 23; Dkt. #17, p. 25)  Hill argues the ALJ "selectively

8 ignored" evidence to the contrary in the multiple ambulance reports

9 and ER treatment notes.  He argues the evidence shows he "suffers

10 significantly from these 'mild' limitations."  Dkt. #17, p. 25.

11 Hill cites one example, his EKG results of January 26, 2009, noting

12 "bigeminy of 48 making an effective rate of perfusion of 24 beats

13 per minute given the inefficient nature of the bigeminal beat."

14 (A.R. 760; Dkt. #17, p. 25)  Hill asserts this "perfusion of 24

15 beats per minutes . . . could indeed cause symptoms"; however, the

16 examining physician drew no such conclusion, merely observing that

17 Hill does, in fact, suffer from bigeminy.  (*See id.*)

18     Hill fails to address the other evidence upon which the ALJ

19 relied in finding his subjective complaints less than fully

20 credible.  The ALJ noted Hill had a normal treadmill test in March

21 2008, and despite repeated EKGs and other diagnostic tests by ER

22 doctors and his treating physicians, doctors have never linked

23 Hill's bigeminy/trigeminy or PVCs to his chest pain.  Hill has been

24 resistant to doctors' suggestions that his medications could be

25 causing, or contributing to, his pain.  In addition, as the ALJ

26 noted, psychological testing suggests Hill exaggerates his

27 symptoms.  Similarly, at least one doctor noted that Hill's "gait

28 was somewhat suspicious for malingering," observing that Hill

82 - FINDINGS & RECOMMENDATION

walked normally and without exhibiting pain for several steps, and then developed a "flapping" motion with his left foot, although he exhibited no weakness in his left foot or leg on examination.  This evidence indicates that although Hill has numerous physical complaints, there is no objective medical evidence of an impairment that is likely to cause the pain and physical limitations of which Hill complains.  Thus, the objective medical evidence supports the ALJ's credibility determination.

### b.  Hill's daily activities

The ALJ also relied on his assessment of Hill's daily activities in finding Hill's testimony not fully credible.  Hill argues the ALJ erred in concluding his activities of daily living are evidence of the ability to perform full-time work.  Dkt. #17, pp. 29-31.  He asserts the ALJ mischaracterized his testimony "in order to make Dr. Sy and the multiple ambulance witnesses and ER doctor' reports appear inconsistent with the facts."  *Id.* (citing *Stone v. Heckler*, 761 F.2d 530, 533 (9th Cir. 1985) "(an ability to go hunting did not establish the claimant's abilities absent evidence of how the hunting was conducted)"; *Tackett v. Apfel*, 180, F.3d 1094 (9th Cir. 1999) "(plaintiff's reference to a road trip to California was not evidence of an ability to sit 8 hours a day based upon the absence of information about rest stops and whether the claimant rode in a reclining, seated or other position).")

Hill argues his reported activities "were performed sporadically, inconsistently and minimally," and the record does not contain evidence that he could perform work activities regularly, consistently, and reliably. Dkt. #17, p. 30.  The court

83 - FINDINGS & RECOMMENDATION

1 agrees with Hill.  In *Molina v. Astrue*, 674 F.3d 1104 (9th Cir.

2 2012), the Ninth Circuit explained:

> While a claimant need not "'vegetate in a dark
> room'" in order to be eligible for benefits,
> *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir.
> 1987) (quoting *Smith v. Califano*, 637 F.2d
> 968, 971 (3d Cir. 1981)), the ALJ may dis-
> credit a claimant's testimony when the
> claimant reports participation in everyday
> activities indicating capacities that are
> transferable to a work setting, *see Morgan v.
> Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 600
> (9th Cir. 1999); *Fair [v. Bowen]*, 885 F.2d
> [597,] 603 [(9th Cir. 1989)].  Even where
> those activities suggest some difficulty
> functioning, they may be grounds for discred-
> iting the claimant's testimony to the extent
> that they contradict claims of a totally
> debilitating impairment. [Citations omitted.]

12 *Molina*, 674 F.3d at 1112-13.  The daily activities reported by Hill

13 do not contradict his claim that he is disabled by his impairments.

14 *See, e.g.*, *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001)

15 ("[T]he mere fact that a plaintiff has carried on certain daily

16 activities, such as grocery shopping, driving a car, or limited

17 walking for exercise, does not in any way detract from her

18 credibility as to her overall disability.  One does not need to be

19 'utterly incapacitated' in order to be disabled.") (citing *Fair v.

20 Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).  The *Vertigan* court

21 noted that a claimant's activities may not necessarily be

22 transferable to the work setting when one takes into account the

23 claimant's pain from activities that are continued for a longer

24 period of time.  *Id.*

25     The ALJ emphasized the fact that when Hill completed a

26 disability questionnaire at the time he filed his application for

27 benefits, he reported that he did no household chores or cooking,

28 but at the ALJ hearing, Hill stated he "cooks prepared foods and

84 - FINDINGS & RECOMMENDATION

stir-fry, and he does household chores including washing the
dishes." (A.R. 25)  The ALJ cited these as inconsistent statements
that undermine Hill's credibility.  (*Id.*)  More than two years had
elapsed between the time Hill completed the form and the date of
the ALJ hearing, during which time Hill's needs and living
situation could have changed.  The ALJ did not question Hill about
these inconsistencies at the hearing.  Without more, the court
finds these unexplained, minor inconsistencies between Hill's
responses on the disability form and his statements two years later
do not impugn Hill's credibility regarding his daily activities.

     The ALJ noted Hill does some household chores, such as dishes;
he cooks prepared foods and stir-fry on occasion; he gets his
teenage son off to school in the morning; he drives and occasion-
ally shops for groceries; he reads books and does crossword
puzzles; and he takes occasional short walks with his son.  At
best, these daily activities provide only a scintilla of evidence
to support a finding that Hill is able to work.  The ALJ also noted
Hill asked his doctor to fill out a form for a disabled hunting and
fishing permit; however, there is no evidence in the record to
indicate Hill ever obtained the permit, or thereafter engaged in
any hunting or fishing activities, or what those activities
consisted of if they occurred.  While a desire to seek such a
permit is some evidence of Hill's perception of his physical
abilities, the request for his doctor to fill out the form is
insufficient on its own to reject his testimony as lacking in
credibility.

     The Ninth Circuit recognizes two grounds for using daily
activities to form the basis of an adverse credibility deter-

85 - FINDINGS & RECOMMENDATION

mination.  The first is when a claimant's daily activities contra-
dict the claimant's other testimony.  To be contradictory, it would
seem the "daily activities" would have to be engaged in "daily," or
at least more frequently than occasionally.  The second is when the
"'claimant is able to spend a substantial part of his day engaged
in pursuits involving the performance of physical functions that
are transferable to a work setting.'"  *Orn v. Astrue*, 495 F.3d 625,
639 (9th Cir. 2007) (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th
Cir. 1989); citing *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir.
2005)).  Thus, to meet the second ground, a claimant's daily
activities must be "'transferable' to a work setting," and the
claimant must spend "a 'substantial' part of his day engaged in
transferable skills."  *Id.* (quoting *Fair*, 885 F.2d at 603).
Significantly, "[t]he ALJ must make 'specific findings relating to
[the daily] activities' and their transferability to conclude that
a claimant's daily activities warrant an adverse credibility
determination."  *Id.* (quoting *Burch*, 400 F.3d at 681).  No such
findings were made by the ALJ in the present case.

The evidence regarding Hill's daily activities does not
support the ALJ's credibility analysis.  Hill's daily activities
are not inconsistent with his allegation that he is unable to work.

### c. *Conclusion*

Thus, the evidence regarding the credibility of Hill's
subjective complaints is conflicting.  The objective medical
evidence does not conclusively establish the existence of physical
impairments that would produce the limitations Hill claims.  Hill's
limited, sporadic, daily activities, on the other hand, suggest he

1 is, in fact, significantly limited, supporting his subjective

2 claims.  As noted above, where the evidence, taken as a whole, can

3 support more than one rational interpretation, the court must

4 uphold the ALJ's decision.  *Bray*, 554 F.3d at 1222 (citing

5 *Massachi*, 486 F.3d at 1152).  As a result, the court finds the ALJ

6 did not err in finding Hill's subjective complaints not fully

7 credible.

8

9 **2.   Weight given Dr. Sy's opinion**

10      Hill argues the ALJ improperly dismissed Dr. Sy's opinions,

11 which Hill asserts are supported by the record evidence.  The ALJ

12 found Dr. Sy's opinion was based primarily on Hill's self-report

13 that he is unable to work.  The ALJ also noted Dr. Sy wrote his

14 opinion letter only a month before the doctor directed ER

15 physicians not to give Hill any more Demerol.  The ALJ faulted

16 Dr. Sy for failing to mention Hill's "drug seeking behavior" in his

17 report.   He further found Dr. Sy's opinion regarding Hill's

18 functional abilities lacked any analysis or citation to medical

19 evidence to support his conclusory statements.  (A.R. 24-25)

20      The ALJ's repeated reference to Hill's "drug seeking behavior"

21 is somewhat problematic.   The record documents Hill's allergic

22 reaction to most narcotics, and evidences his refusal to accept

23 narcotics on repeated occasions.   Hill provided a reasonable

24 explanation for his request for I.V. Demerol when he visited the

25 ER; i.e., that he experienced untoward side effects from oral

26 Demerol that were not present when the medication was injected.

27 Nevertheless, Hill did exhibit some very peculiar behavior in

28 November and December of 2009, requesting Demerol after being told

87 - FINDINGS & RECOMMENDATION

Dr. Sy did not want him to receive the drug, and leaving the ER before receiving treatment on a couple of occasions. His behavior during this short period of time did appear to be drug-seeking, and it was not error for the ALJ to draw that conclusion. However, the short duration of this behavior in the continuum of Hill's medical treatment did not warrant the ALJ's repeated references to, and apparent reliance on, the behavior in assessing Hill's overall credibility. Further, it makes no sense for the ALJ to fault Dr. Sy for failing to mention Hill's drug-seeking behavior when, as the ALJ noted, the doctor's opinion letter was written a month *before* he was contacted by the ER doctor regarding Hill's use of Demerol. The court finds these are not sufficiently "specific and legitimate reasons," supported by substantial evidence in the record, for rejecting the opinion of Hill's treating physician. *See Benton*, 331 F.3d at 1036; *Lester*, 81 F.3d at 830.

The court further finds, however, that Dr. Sy's checklist designations regarding Hill's functional abilities is insufficient, standing alone, to support a finding that Hill is unable to work. The case should be remanded with instructions for the ALJ to either obtain further clarification from Dr. Sy regarding the bases for his opinions, or obtain an independent functional evaluation of Hill, or both.

### B. Weight Given to Psychological Evaluation

Hill argues the ALJ erred in according significant weight to Dr. Ethel-King's opinions based on his psychological evaluation of Hill. He argues the ALJ failed to develop the record fully and fairly with regard to his claim that his mental impairments are

severe.  Dkt. #17, pp. 31-32.  Hill's attorney cites his own three-page hearing memorandum in support of his assertion that the doctor's opinion supports "undiagnosed but well-documented symptoms of somatoform disorder[.]"  *Id.*, p. 32.

Hill's argument is unpersuasive and unsupported by the record evidence or applicable law.  The court finds the ALJ did not err in the weight he gave to Dr. Ethel-King's evaluation.  In fact, the ALJ went further, and found Hill's "anxiety disorder results in mild limitations in social functioning and moderate limitations in concentration[,] persistence and pace."  (A.R. 24)

The court further finds, however, that the record was not appropriately and fully developed with regard to Hill's mental impairment.  "'In Social Security cases, the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'"  *Hayes v. Astrue*, 270 Fed. Appx. 502, 504 (9th Cir. 2008) (quoting *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983) (per curiam)).  "This duty exists even when the claimant is represented by counsel."  *Id.*  Fulfilling this duty may require the ALJ to consult a medical expert or to obtain a consultative examination.  *Loeks v. Astrue*, slip op., 2011 WL 198146, at *5 (D. Or. Jan. 18, 2011) (Haggerty, J.) (citing 20 C.F.R. §§ 404.1519a, 416.919a).  "Relatedly, an ALJ must take reasonable steps to ensure that issues and questions raised during the presentation of medical evidence are addressed so that the disability determination is fairly made on a sufficient record of information."  *Id.* (citing *Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1999); 20 C.F.R. §§ 404.1527(c)(3) and 416.927(c)(3) ("explaining how an ALJ may obtain additional evidence where

89 - FINDINGS & RECOMMENDATION

1 medical evidence is insufficient to determine whether claimant is
2 disabled"); 20 C.F.R. §§ 404.1512(e) and 416.912(e) ("obtaining
3 additional information from treating doctors")).  However, if the
4 record evidence is unambiguous, and is sufficient to allow for
5 proper evaluation, then the duty to develop the record further is
6 not triggered.  *Id.* (citing *Mayes v. Massanari*, 276 F.3d 453, 459-
7 60 (9th Cir. 2001)); *Frampton v. Astrue*, slip op., 2010 WL 373867,
8 at *13 (D. Or. Jan. 29, 2010) (Mosman, J.) (same).

9  Here, the state agency did obtain a consultative psychodiag-
10 nostic evaluation of Hill from Dr. Ethel-King.  However, as Hill
11 notes, Dr. Ethel-King's findings suggest Hill may suffer from a
12 somatoform disorder or other anxiety disorder.  The court finds the
13 record is not developed fully regarding Hill's mental impairments.
14 In particular, the record contains no opinion evidence, either from
15 Hill's treating sources or from agency consultants, regarding
16 Hill's ongoing *belief* that his physical condition requires frequent
17 emergency medical treatment.  This is discussed more fully in the
18 next section of this opinion.  The record also is insufficiently
19 developed regarding the presence or absence of a somatic disorder
20 and, if present, its role, if any, with respect to Hill's alleged
21 disability.

22

23     **C.  *Lack of Vocational Testimony***

24  Hill argues the ALJ erred in failing to take vocational
25 testimony.  The Commissioner acknowledges Hill made a showing that
26 he is unable to perform his past relevant work, shifting the burden
27 of production to the Commissioner to show Hill is able to perform
28 other work.  *See* Dkt. #19, ECF p. 24.  The Commissioner argues the

ALJ properly relied on the Medical-Vocational Guidelines (the "Grids"), rather than obtaining vocational testimony. *Id.* (citing *Lockwood v. Comm'r*, 616 F.3d 1068, 1071 (9th Cir. 2010); 20 C.F.R. § 404.1520(a)(4)(v)).  However, although the ALJ cited the Grids, he failed to provide adequate explanation for his reliance on the Grids.  He made a finding that although Hill cannot perform the full range of light work, his "additional limitations have little or no effect on the occupational base of unskilled light work." (A.R. 27)  This conclusory finding fails to address Hill's non-exertional limitations adequately.  "'A non-exertional impairment, if sufficiently severe, may limit the claimant's functional capacity in ways not contemplated by the guidelines.  In such a case, the guidelines would be inapplicable.'"  *Tackett v. Apfel*, 180 F.3d 1094, 1102 (9th Cir. 1999) (quoting *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 577th Cir. 1988) (Pregerson, J., concurring)).

An ALJ may rely solely on the Grids only when they "'accurate-ly and completely describe the claimant's abilities and limita-tions.'"  *Id.* (quoting *Jones v. Heckler*, 760 F.2d 993, 998 (9th Cir. 1985); citing 20 c.F.R. pt. 404, subpt. P, app. 2, rule 200(e); *Desrosiers*, 846 F.2d at 577).  Here, the ALJ erred in failing to develop the record further regarding Hill's mental impairment - an impairment the evidence suggests may significantly erode Hill's ability to work.  The court finds particularly troubling the lack of any opinion in the record regarding the vocational impact of the frequency with which Hill has sought, and

1  apparently continues to seek, emergency medical treatment.[16]    ER
2  doctors have told Hill that his chest pain episodes are not related
3  to his cardiac conditions, and he should consult with his regular
4  doctor before seeking emergency treatment.    However, Hill has
5  stated repeatedly to the ER doctors that when his chest pain
6  develops, he has no way of knowing if - "this time" - the pain is
7  related to a cardiac event or TIA.    He fears that if he does not
8  seek immediate treatment, he will die.    The issue here is whether
9  Hill has a severe mental impairment causing these fears, and his
10 resulting frequent trips to the ER and his doctors, and if so, how
11 that impairment would affect his ability to sustain an ordinary,
12 full-time work routine.    A vocational expert's testimony is
13 required at step five of the analysis "[w]hen a claimant's non-
14 exertional limitations are 'sufficiently severe' so as to
15 significantly limit the range of work permitted by the claimant's
16 exertional limitations[.]" *Burkhart v. Bowen*, 856 F.2d 1335, 1340
17 (9th Cir. 1988) (citing *Desrosiers*, 846 F.2d at 577).

18     The court finds the record is insufficient to determine
19 whether Hill has a non-exertional impairment which is sufficiently
20 severe to require a vocational expert's testimony to determine
21 whether there are specific jobs Hill can perform within his
22 capabilities.    Therefore, remand is appropriate for further
23 proceedings.

24

25     [16]The evidence establishes that Hill sought treatment for his
26 conditions at least 20 times in 2005, 31 times in 2006, 18 times in
   2007, 14 times in 2008, and 16 times in 2009.    He sought emergency
27 treatment once in 2005, ten times in 2006, eleven times in 2007,
   eight times in 2008, and fifteen times in 2009, often several times
28 in a single week.

### D.  RFC Determination

Lastly, Hill argues, "The ALJ's [past relevant work] findings are unsupported by the evidence because the hypothetical presented to the VE contained defective RFC findings." Dkt. #17, p. 33.  The argument makes no sense - there was no vocational expert testimony, and no hypothetical question was presented to a VE.  Hill's arguments in this section challenging the ALJ's RFC determination echo his previous arguments and are, therefore, addressed above.

### VI.  CONCLUSION

For the reasons discussed above, I recommend the Commissioner's decision be reversed, and this case be remanded for further proceedings.

### VII.  SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge.  Objections, if any, are due by **February 22, 2013.** If no objections are filed, then the Findings and Recommendations will go under advisement on that date.  If objections are filed, then any response is due by **March 11, 2013.**  By the earlier of the response due date or the date a response is filed, the Findings and Recommendations will go under advisement.

IT IS SO ORDERED.

Dated this <u>4th</u> day of February, 2013.

/s/ Dennis J. Hubel

Dennis James Hubel
Unites States Magistrate Judge

93 - FINDINGS & RECOMMENDATION